Argued and submitted November 2, 1990, affirmed March 6, reconsideration denied May 29, petition for review denied June 20, 1991 (311 Or 433)

## STATE OF OREGON,
*Appellant,*

*v.*

## JASON F. D. MATTHYS
and Jeffrey Ryan Hocken,
*Respondents.*

(893791 and 893792; CA A63693)

808 P2d 94

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Guy B. Greco, Newport, argued the cause and filed the brief for respondent Jason F. D. Matthys.

Steven R. Swenson, Newport, argued the cause for respondent Jeffrey Ryan Hocken. With him on the brief was Law Offices of Robert W. Connell, Newport.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

Defendants were charged with burglary in the first degree, ORS 164.225, and theft in the first degree. ORS 164.055. The state appeals a pre-trial order suppressing evidence. We affirm.

At about 11:50 a.m. on October 4, 1989, Officer Teem was patrolling in a residential area of Newport. He saw an orange Camaro parked off the roadway. No one was in or near the car. It had been backed into foot-high brush to the tree line at a point where a trail leads up a hill to a residential neighborhood. The car had no license plate, but a temporary registration was on the rear window. The officer thought it was unusual to see an expensive new car parked like the Camaro was and got out to investigate. The car was locked, and the interior was clean, with the rear seats upright and nothing unusual in the rear hatchback area. There was a black duffel bag on the back seat.

Teem followed the trail through the brush behind the car. The trail traverses the hill into woods, leads over a foot bridge and continues up the hill to homes. Teem saw footprints leading away from the car and up the path, which he followed to the residences. After about 15 minutes, he returned to his patrol car and ran a check on the registration. While he was waiting for a response to his inquiry, a person came from a house almost directly across the road and explained that his wife had called him home from work, because she had seen the Camaro drive up with two young men in it. His wife had watched the men sit in the car, look around, park the car and follow the trail into the brush. She had never seen the car before.

Teem was concerned that the car might have been stolen or might be involved in a drug transaction or a daylight burglary. About one-half of the burglaries in Newport occur during daylight, because of the large number of vacation homes that are not occupied during the week. Teem waited around the area, but, when nothing further happened, he left.

At about 1:40 p.m., Teem was with Sergeant Huber when both heard a radio dispatch that a citizen had reported that two men had returned to the Camaro, put something into it and left again. Teem returned to the car and saw that the

interior had been altered. The rear seats were folded down, and the hatchback area was covered with a luggage cover. Clothing was stuffed along the side to block the view into the cargo area. Teem could not see the duffel bag. He checked the trail again and found two large pins similar to cotter pins and two thinner pieces of metal about fourteen inches long with loops on their ends. He was certain that the pins had not been there earlier.

At 2:10 p.m., Teem was nearby in his patrol car when a truck driver told him that the two men were leaving. Teem immediately returned to the area. The Camaro was pulling onto the roadway, and Teem pulled up to it so that it could not leave. Huber arrived soon after. Matthys was driving the car, and Hocken was in the passenger seat. Teem asked for identification, and they complied. When Teem asked what they had been doing in the area, they said that they had just stopped to urinate in the shrubbery. By then, Teem had learned that the car was registered to a Mrs. Hocken. He did not know Matthys, but had been told by a fellow officer of Hocken's possible involvement in a theft. He had also been told that Hocken previously had tried to elude police by driving the Camaro at a high speed in order to avoid being cited for a traffic infraction. Teem almost immediately asked defendants to get out of the car, and they did.

Both Hocken and Matthys acted irritated at being stopped, and Teem described their attitude as "somewhat agitated" and "becoming more aggressive," as he continued to talk to them. Teem described defendants as "tense" and their comments as "terse." Defendants made no verbal threats.

Teem strongly believed that a crime, probably burglary, had occurred. He testified that, in an "arrest or unknown-encounter-type of situation" or in dealing with a person who may have just committed a crime, he had been taught that an officer is at risk of assault. He testified that all of the circumstances, including the location of the car, his inability to find the people connected with the car and the "proclivity" of Hocken in wanting to avoid the police, made him feel that there was a likelihood of a situation in which he would be jeopardized. As Teem talked to defendants, he patted them down. In Hocken's pockets, he found a flat-blade screwdriver, needle-nose pliers and a pair of athletic socks. Both

defendants were wearing shoes and socks. On the basis of his 8 1/2 years of police experience and training, Teem knew that the tools could be used to commit burglaries or thefts from cars and also that burglars frequently wear socks over their hands to hide their fingerprints.

Hocken explained that he had the tools in his pocket because he had been working on speakers for his car. He did not answer the inquiry as to why he had the socks. In response to further questions, defendants contended that they had walked into the trees and had sat on the bridge for more than an hour and smoked cigarettes. Matthys said that he had returned to the car and put his sweatshirt in it. Teem had not seen defendants during his first investigation, nor had he seen cigarette butts. He had not heard voices. When defendants learned that Teem had been to the bridge, they said that they had wandered around the bridge. They denied seeing the metal pieces on the trail.

Teem and Huber believed that a burglary had taken place and that there would be evidence of burglary in the car. Huber went up the trail to try to find out where the burglary had occurred but was unable to do so, despite a perimeter search of residences for signs of entry. He returned, and the officers asked for consent to search the Camaro. Hocken refused. Teem then searched it and found, among other items, electronic equipment and a large backpack from which the metal pins appeared to have come and which had twigs and leaves in it consistent with the foliage on the trail. The equipment included a tape deck of the type found in home systems with wire connectors on it, a camcorder and a compact disc player. In the black duffel bag, Teem found stereo speakers that appeared to have been taken from a cabinet and which still had wood attached to them. Because the officers did not know who the victim was, they did not believe that they could charge defendants with a specific crime and did not arrest them at that time. The items were later determined to have been taken in a burglary in the area.

The trial court concluded that the stop of defendants' car, the frisk and the seizure of the tools were lawful. It held, however, that the officers did not have probable cause to search the car, because they had no information that a crime had been committed.

■ The trial court did not err in finding that the stop was valid. The officers could stop the car if there was a reasonable suspicion that a crime had been committed. ORS 131.615; *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977). The Camaro had been parked for over two hours in an unusual location with no one around. Nearby residents had reported that the two men had at first sat looking over the neighborhood and had later brought something to the car and left it. Teem found metal pins on the ground in his second investigation, supporting a belief that something had been carried down the hill to the car from the direction of the residential area. The interior of the Camaro had been altered between Teem's two investigations, and care had been taken to prevent a view into the cargo area. Those are articulable facts that provide a basis for the officers reasonably to suspect that the two men had "cased" the neighborhood, had left the car at a distance, but accessible to residences, and then had committed a burglary and hidden whatever they had stolen in the car.

■ However, the trial court erred in holding that the frisk was lawful. ORS 131.625 provides:

"(1) A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present.

"(2) If, in the course of the frisk, the peace officer feels an object which the peace officer reasonably suspects is a dangerous or deadly weapon, the peace officer may take such action as is reasonably necessary to take possession of the weapon."

An officer in the field has considerable latitude in taking precautions to ensure his safety, and we are reluctant to second-guess those decisions. *State v. Bates,* 304 Or 519, 524, 747 P2d 991 (1987). Nevertheless, we must determine whether the circumstances confronting the officers justified a reasonable suspicion that either defendant was armed and presently dangerous. ORS 131.625(1).

The trial court made no findings as to what facts gave rise to reasonable suspicion that defendants were armed and

dangerous. It restated what Teem had given as his reasons.[1] Teem characterized his concerns basically as those involved in a tense "unknown situation," his training having been that, in those situations, there is a chance that an officer will be assaulted. We do not ignore the importance or legitimacy of an officer's generalized concern for safety in any unknown situation. However, ORS 131.625 requires more than a generalized concern to justify a frisk. There must be particularized facts which give rise to a reasonable suspicion that a suspect poses an immediate threat.[2] Those facts were lacking here.

Nothing before the stop suggested that defendants were dangerous. Although the car was in an unusual location, it was not hidden. It had no license plates, but Teem had seen the temporary registration, which gave a local name and address. He had not seen any weapon on either inspection. During the stop, defendants did nothing to suggest that they posed an immediate threat. They made no effort to elude the police and complied with the requests for identification. Teem stated that, because of Hocken's reputation, he "was concerned" to avoid a pursuit situation, but Matthys was driving the car. Teem had no basis to believe that Matthys would try to get away; he was a "complete unknown" and Teem "hadn't ever heard of him before." Defendants got out of the car when they were asked and the keys were left in the car. There were two officers at the scene.

Nothing happened between the stop and the frisk to give rise to a reasonable belief that there was an immediate threat. Teem's request that defendants get out of the car was made "almost immediately," "within a minute or two minutes" after the stop. Defendants were told to go to the back of the car. The frisk took place as the officers engaged defendants in conversation.

Teem explained that defendants' manner became

---

[1] The trial court found that

"[Teem] gave as his reason for conducting a pat-down search the negative body language and behavior of the Defendants, tenseness of the situation and because of his concern for his own safety[.]"

[2] Teem also testified that he did a pat-down "because of the situation, their actions of being so physically tense, so terse in their comments and seeming to not want to be there having conversation with me * * *." Tenseness and reluctance to talk do not demonstrate an immediate threat.

"more aggressive." However, his testimony makes it clear that defendants' manner developed during or after the frisk, not before:

> "Q. When you had [defendants] step out of the car, did you think Mr. Matthys was dangerous at that moment?
>
> "A. I felt that there was a likelihood, yes, because I was dealing with an unknown situation.
>
> "Q. How long after he was out of the vehicle was it that you patted him down?
>
> "A. Immediately. To the back of the car — I had him step to the back of the car, and Sergeant Huber arrived and at that point talked to him. And, as I was talking to him, I did a pat down on his person."

Teem described defendants' manner at the initial contact as one of "irritation," a "why-are-you-hassling-me-type of attitude" and as "somewhat agitated." He testified that it was "later on in the contact" that their body language and conversation became "somewhat more agitated, more aggressive." Defendants' apparently hostile after-the-fact behavior cannot justify the frisk. The facts do not support a reasonable suspicion that, when the pat-down began, defendants were armed and presently dangerous. The items on defendants' persons were found in an illegal search and should have been suppressed.

The trial court concluded that the search of the car could not be sustained, because the officers did not know that a crime had been committed. We do not address the state's challenge to that reasoning, because, without the evidence obtained in the illegal search of defendants, there was no probable cause to search the car. A mobile automobile may be searched without a warrant if there is probable cause to believe that it contains evidence of a crime; the test is whether a magistrate could issue a search warrant on the basis of the probable cause articulated by the officers. *State v. Brown,* 301 Or 268, 276, 721 P2d 1357 (1986). We conclude that the test is not met here.

In *State v. Spencer,* 101 Or App 425, 790 P2d 1205 (1990), the officers acted on a phone call that two suspicious men were walking down the street, possibly carrying a television in a plastic bag. They intercepted the defendant in a high burglary rate area of Portland. They asked what was in the

bag, and the defendant answered that it was his VCR that he had retrieved from a friend. He began to sweat. The officers had had no recent reports of burglaries. They opened the bag and, by comparing serial numbers, determined that the VCR had been stolen. We held that the defendant's motion to suppress should have been granted, because the officers' suspicion, no matter how well founded, that a crime had been committed did not reach the level of probable cause.

The situation here is analogous. Teem testified that the items taken from Hocken's pocket were probably used in a burglary and that he would find stolen items in the car. Without the evidence seized during the frisk, the officers had only a suspicion about what defendants had been doing on the hill or that seizable items would be discovered. They had received no report of a crime and had not been able to discover a crime in their search of the neighborhood. While defendants' answers to the officers' questions were evasive, they described legitimate activities. The officers' suspicion that defendants had committed a crime may have been a practiced good guess, "but a suspicion, no matter how well founded, does not rise to the level of probable cause." *See State v. Verdine,* 290 Or 553, 557, 624 P2d 580 (1981). There was no error in suppressing the evidence from the car.

Affirmed.