Argued and submitted January 31, 1995, reversed and remanded for new trial March 13, petition for review allowed July 23, 1996 (323 Or 690)

STATE OF OREGON,
*Respondent,*

*v.*

SCOTT ERIC STANLEY,
*Appellant.*

(10-93-01272; CA A81472)

912 P2d 948

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Rives Kistler, Assistant Attorney General, argued the cause for respondent. On the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Robert M. Atkinson, Assistant Attorney General.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

De MUNIZ, J.

Deits, P. J., concurring in part; dissenting in part.

## De MUNIZ, J.

Defendant was charged with unlawful possession of a controlled substance. ORS 475.992(4)(b). He appeals the trial court's denial of his motion to suppress evidence of methamphetamine. We reverse.

In January 1993, Springfield police officer Kemper responded to a dispatch call regarding suspicious activities at the Glenwood Market. One of the store clerks had reported to the police that she was concerned about two men, whom she described as "very high on something," who had been on the premises for about an hour. One of the men had entered the store and asked her where the police were located and how often they came by the store. The clerk believed that the men were planning to rob the store and expressed concern for her safety.

When Kemper arrived, she saw two men standing at a pay phone near the store entrance. One of the men, McCoy, was using the phone, and the other, defendant, was standing nearby holding a briefcase. Kemper noticed that defendant was wearing a pager and was holding an open spiral notebook, on which was written a long list of first names and corresponding phone numbers. Based on her training and experience, she testified that these activities "were consistent with persons buying or selling controlled substances." Kemper did not interrupt McCoy's phone conversation, but asked defendant what he was doing at the store. She characterized his behavior as "very extreme." Kemper testified that defendant's eyes were extremely dilated and that they were "blinking and bouncing." She said that he was agitated, that he could not stand still, and that his speech was so rapid that she could not understand what he was saying. She described defendant as the "most extreme case of stimulant intoxication that I have ever encountered." McCoy displayed similar symptoms. Based on her training and experience, Kemper believed that both men were under the influence of a stimulant, such as methamphetamine, and that it was necessary to take them into custody to "detox" them.

Shortly after Kemper arrived at the market, another officer, Maloney, arrived. At that time, Kemper

stepped aside to talk with McCoy. When Kemper observed a large "roundish square" object in McCoy's left front jacket pocket, she became concerned that he was carrying a gun or a knife. She asked him if she could pat him down for weapons, and he nodded his assent. As she patted the object in the pocket, McCoy grabbed her hand in what she characterized as an "aggressive, very negative move." She then arrested him for harassment and searched him incident to that arrest. During that search, she did not find a weapon but, instead, found a marijuana pipe and an unused syringe.

While Kemper was talking with McCoy, Maloney approached defendant and immediately patted him down for weapons. Maloney testified that he was concerned for his safety, because he was responding to a possible robbery call and because, in his experience with robberies "the person either simulates or is armed." During the pat-down, Maloney felt a metal container that did not feel like a weapon. He did not seize the container, but asked defendant, "Would you be willing to show me [the container]?" Defendant opened the container and revealed three prescription pills. Maloney did not seize the container or the pills and allowed defendant to place them back in his shirt pocket.

After Kemper placed McCoy in the patrol car, she joined Maloney and defendant. Maloney asked defendant if he would show Kemper the pills in the container. Defendant agreed to do so and opened his jacket to get the container. As defendant opened his jacket, both officers testified that they recognized a strong odor of methamphetamine. Kemper said that because the odor was strong enough to burn her nose, she concluded that defendant had not just been in contact with methamphetamine, but was presently in possession of the substance. She testified that it had been her experience "100 percent of the time" that when she encountered an odor that strong, the person was actually in possession of methamphetamine. Kemper then placed defendant under arrest for possession of a controlled substance and searched him incident to that arrest. She found marijuana and methamphetamine.

Defendant moved to suppress evidence of the smell of the methamphetamine, as well as evidence of the methamphetamine itself. The trial court denied the motion, and defendant assigns error to that ruling. He argues that his stop and initial frisk were unlawful in violation of Article I, section 9, of the Oregon Constitution[1] and that the evidence of methamphetamine obtained after his arrest must be suppressed as "the fruit of the illegal search."

■    Defendant argues that the frisk of defendant was unlawful.[2] The state first argues that because both officers had concluded that it would be necessary to take defendant into civil custody for detoxification under ORS 426.460,[3] it was permissible for them to conduct a cursory open hand pat-down for weapons for safety purposes. The state may be correct that such a limited pat-down is justified whenever a person is taken into custody. *See State v. Hoskinson*, 320 Or 83, 87, 879 P2d 180 (1994); *State v. Owens*, 302 Or 196, 200, 729 P2d 524 (1986). However, there is no evidence that, at the time Maloney conducted the pat-down, he had decided to take defendant into custody.[4] Consequently, Maloney's frisk of defendant may not be justified on the ground that defendant was to be taken into custody for detoxification.

The state next argues that the frisk was justified as necessary for officer safety. ORS 131.625(1) authorizes a police officer, during the course of a lawful stop, to frisk a person for weapons if "the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present." We have held, however, that in order to justify the frisk, the officer must articulate a particularized suspicion that the stopped person poses an

---

[1] Defendant also argues that the stop and frisk violated the Fourth Amendment of the United States Constitution. However, we decline to apply a federal constitutional analysis, because, in his motion to suppress, defendant relied exclusively on Article I, section 9, of the Oregon Constitution.

[2] Defendant also argues that the stop was unlawful. However, in view of our determination that the frisk was unlawful, it is unnecessary to address that issue.

[3] In 1995, the statute was renumbered at ORS 430.399.

[4] Kemper testified that after her first contact with McCoy and defendant, she quickly decided to take them into custody for detoxification. However, there is no indication in the record that Kemper communicated this information to Maloney before he frisked defendant. Instead, Maloney testified that the first thing he did when he arrived on the scene was to frisk defendant for weapons.

"immediate threat." *State v. Lumpkin,* 133 Or App 265, 269, 891 P2d 660, *rev den* 321 Or 138 (1995); *State v. Matthys,* 106 Or App 276, 282, 808 P2d 94, *rev den* 311 Or 433 (1991).

Here, the state asserts that the following facts support Maloney's suspicion that defendant posed an immediate threat: (1) Maloney was confronted with a subject who appeared to be very intoxicated and hyper; (2) Maloney was responding to what he believed was a possible robbery attempt; (3) it was Maloney's experience that people who commit robberies are often armed; and (4) Maloney knew that McCoy and defendant had questioned the store clerk about the whereabouts of the police.

In assessing whether there are sufficiently particularized facts to support an officer's suspicion that the stopped person posed an immediate threat, we may consider only the information that the officer had at the time the frisk took place. ORS 131.605(4). The evidence here is that the first thing Maloney did after arriving on the scene was to walk over and frisk defendant. There is no evidence that Maloney observed defendant to be intoxicated or hyperactive, or that Kemper told Maloney of her observations before the frisk occurred. Accordingly, this case is distinguishable from other cases, such as *State v. Smay,* 118 Or App 31, 845 P2d 1294 (1993), on which the state relies, where the frisk was justified by the officer's observations of a suspect's nervous behavior.

The only remaining facts that support a suspicion that defendant posed an immediate threat are Maloney's general concerns for safety in responding to a robbery call and his knowledge that one of the men had inquired about the whereabouts of the police. We are not unmindful of the legitimacy of an officer's generalized concerns for safety in such circumstances, but that alone is not enough to justify a frisk. ORS 131.625(1) requires that there be particularized facts giving rise to the suspicion that a suspect poses an immediate threat. Such facts are lacking here. *See Matthys,* 106 Or App at 282. Thus, we conclude that the initial frisk of defendant was unlawful.

Nonetheless, the state argues that the evidence of the methamphetamine should not be suppressed, because the odor of the methamphetamine was discovered during a valid consent search. Defendant responds that the evidence of the odor of methamphetamine and the methamphetamine, itself, must be suppressed as the tainted fruit of the illegal frisk. In particular, defendant argues that the odor of methamphetamine, which was discovered during the second consent search, must be suppressed because Maloney obtained his consent to that search by exploitation of the illegal frisk.[5] We agree.

■    Unlawful police conduct[6] may affect the validity of consent in one of two ways. It may render a subsequent consent involuntary when the illegality has an "effect on the state of mind of the person giving consent, affecting whether the consent is a voluntary act of that person's free will." *State v. Rodriguez*, 317 Or 27, 38, 854 P2d 399 (1993). Official misconduct may also invalidate an otherwise voluntary consent if "the police have exploited their prior unlawful conduct to obtain that consent." *Id.* at 39-40. In *Rodriguez*, the court found no exploitation of an INS agent's allegedly illegal arrest in obtaining the defendant's consent to search his residence, because

> "it is apparent that the INS agent did not trade on or otherwise take advantage of the arrest to obtain defendant's consent to the search. Indeed, there is absolutely nothing in the encounter between the agent and defendant that can be construed as exploitation of the purportedly unlawful arrest. The mere fact that, but for the arrest, the agent would not have been standing in the doorway of defendant's apartment, in a position to ask defendant about drugs and guns, does not render the evidence discovered in the subsequent consent search inadmissible." *Id.* at 41.

"The distinction * * * between voluntariness and exploitation is an important one." *Id.* at 38. However, it is

---

[5] Although defendant asserts, without elaboration, that "[t]he illegal frisk rendered involuntary defendant's subsequent consent," defendant grounds his invalid consent argument on Maloney's alleged exploitation of the prior unlawful frisk. Thus, voluntariness of defendant's consent is not at issue.

[6] "Unlawful police conduct" means "an act by a government entity or its agent that violates a defendant's rights under Article I, section 9, of the Oregon Constitution." *State v. Rodriguez*, 317 Or 27, 38 n 12, 854 P2d 399 (1993).

difficult to posit the proper "exploitation" test because cases that could have been decided under either theory do not clarify which is applied. For example, the *Rodriguez* court described *State v. Williamson*, 307 Or 621, 772 P2d 404 (1989),[7] as a "voluntariness" case that could have been based on "exploitation" grounds, but provided little guidance as to how one analysis differs from the other. *Rodriguez*, 317 Or at 40-41.

In *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981),[8] the court purported to apply an exploitation analysis but instead assessed the effect of the illegal search on the voluntariness of the defendant's consent. *Id.* at 394-96. The *Quinn* court found no exploitation because

> "defendant was unaware at the time he gave consent that the underwear had been found. That fact did not in any way affect defendant's decision to give or withhold his consent. The next issue, therefore, is whether unlawful police activity which leads the police to seek defendant's consent to search, but does not influence the defendant in giving that consent, taints the consent[.]
>
> "* * * * *
>
> "[W]hen the police sought defendant's consent to search, they did not do so by exploitation of that illegal discovery. Rather, the consent was sought and given by defendant for reasons entirely distinct from that primary illegality." *Id.* at 394, 396.

By assessing the effect of the illegality on the defendant's *decision*, the *Quinn* court grafted a voluntariness analysis onto an exploitation inquiry.[9] It is clear from *Rodriguez*,

---

[7] In *Williamson*, the defendant consented to a search of his truck after police smelled marijuana and threatened to detain the truck while they obtained a warrant. 307 Or at 623. The consent was involuntary because the police "were trading on evidence that they had only by virtue of the unlawful roadblock," causing the defendant "to weigh the consequences of consent" and thereby affecting his decision to consent. *Id.* at 626. The *Rodriguez* court also found exploitation in *Williamson* because the police were able to obtain consent "only by taking advantage of the unlawful roadblock and by telling the defendant that they would detain his vehicle." *Rodriguez*, 317 Or at 41.

[8] In *Quinn*, before asking for the defendant's consent, police illegally searched his car and discovered women's underwear, which, in turn, led to the defendant's confession to murder. 290 Or at 387-89.

[9] We perpetuated this error in *State v. Jeffers*, 125 Or App 596, 866 P2d 486 (1994), by relying on *Quinn* and focusing solely on the effect the illegal search had

however, that such an analysis is germane to voluntariness but not necessarily to exploitation. Furthermore, there is considerable doubt as to the continued validity of the *Quinn* approach. In his concurring opinion in *State v. Weaver*, 319 Or 212, 874 P2d 1322 (1994), Justice Gillette[10] rejected *Quinn's* exploitation analysis:

> "The * * * conclusion [in *Quinn*] seems to me to approach being (and it may in fact be) unsupportable. So far as the *Quinn* opinion demonstrates, the officers would *never have asked* the defendant for permission to search the car, *had it not been that their attention was directed to him and the car by the result of the earlier, illegal search*. A more direct exploitation of illegal government activity would be difficult to posit." *Id.* at 224 (emphasis supplied).

■     We agree that the proper inquiry is whether the unlawful conduct focused police attention on defendant and prompted the officers to seek his consent, regardless of his awareness of the illegal search or the subsequent discovery of incriminating evidence. Unlike a "voluntariness" analysis, which focuses on the person giving consent, the dispositive consideration in the "exploitation" inquiry is the prior illegality's effect on the police. This is not the "but for" test rejected in *Rodriguez*, because the illegality must give police more than the *opportunity* to seek consent; it must also provide a *reason* for doing so.[11]

This analysis is consistent with the holdings of *Rodriguez, Williamson*, and *State v. Martin*, 124 Or App 459, 863 P2d 1276 (1993), without entangling it with the

---

on the defendant's decision. There, we found no exploitation because, at the time defendant consented, he was unaware that the police had found incriminating evidence during the illegal search of his vehicle. *Id.* at 601-02. Under the analysis outlined below, that holding is now questionable.

[10] Justice Gillette was the author of the majority opinion in *Rodriguez*.

[11] *See also State v. Lyman*, 134 Or App 212, 214, 894 P2d 1219 (1995) ("exploitation occurs when officers 'trade on' information that is obtained as a result of an illegality, *e.g.*, when officers make an unauthorized entry and *observe something that prompts them to seek consent* to search the premises") (emphasis supplied); *State v. Land*, 106 Or App 131, 137, 806 P2d 1156 (1991) (no exploitation of unlawful entry because police smelled marijuana before entering and "did not observe anything that *prompted them to seek defendant's consent*") (emphasis supplied).

issue of voluntariness. In *Rodriguez*, there was no exploitation because it was not the illegal arrest that prompted the INS agent to ask the defendant about drugs and guns.[12] 317 Or at 41. In *Williamson*, there was exploitation because the illegal road block provided police with information (marijuana odor) that prompted them to ask for consent. 307 Or at 623, 626.

In *Martin*,[13] we found exploitation of an illegal search because there "is a direct connection between asking [if the defendant's bag contained more drugs] and the fact that the officer had illegally discovered methamphetamine in the earlier search." 124 Or App at 467. In other words, illegally opening a Dristan tin prompted the officer to ask questions leading to the defendant's consent.

■     Based on the above analysis, we conclude that exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts them either to seek the defendant's consent or to ask questions leading to consent.

In this case, Maloney sought defendant's consent on two occasions. The first occurred when Maloney asked defendant to show him the metal container after feeling it in defendant's pocket during the illegal frisk. Defendant complied, opening the container and revealing "three prescription-type pills." Maloney testified that he knew that prescription drugs are controlled substances and that defendant's possession of those pills could have constituted a crime. Defendant then placed the container back in his pocket. The second request occurred when Maloney asked defendant to show the pills to Kemper.

■     We conclude that Maloney "exploited" his prior unlawful conduct in obtaining the first consent because there is "a direct connection" between asking defendant to

---

[12] The agent was apparently predisposed to ask these questions before the arrest, considering that seven members of a regional drug and organized crime task force accompanied him to the defendant's apartment. *Rodriguez*, 317 Or at 29.

[13] In *Martin*, an officer illegally opened a Dristan tin taken from the defendant, discovered methamphetamine inside and asked the defendant if a paper bag found in his car contained "more drugs." 124 Or App at 461-62. Defendant said it did, and consented to a search of the bag. *Id.* at 462.

produce the container and the fact that Maloney had conducted an illegal frisk. *See Martin,* 124 Or App at 467. Based on the record and the analysis set out above, we conclude that the illegal frisk revealed information — the container's presence in defendant's pocket — that focused Maloney's attention on defendant and prompted him to request consent to search.[14] We also conclude that the second consent was obtained by "exploitation" of the first: The initial unlawful consent revealed information, possession of prescription pills, that caused Maloney to ask defendant to show the pills to Kemper.[15]

The dissent would find exploitation only where the unlawfully obtained information indicates "a defendant's possible involvement in illegal activities." 139 Or App at 539. Because the frisk here "revealed only an innocuous metal container," the dissent would find no exploitation in obtaining the first consent. 139 Or App at 543.[16]

We disagree that the information discovered must implicate the defendant's possible involvement in "illegal activities." Granted, some exploitation cases have involved

---

[14] At the suppression hearing, Maloney testified that defendant

"had a metal container on him and he showed me what was in it and he had some prescription pills.

"Q Is that something you had found in your pat-down search?

"A I had felt it but it didn't feel like a weapon.

"Q So you didn't seize it from him?

"A No.

"Q Did you ask him about it?

"A I asked him to see what was in it.

"Q Do you remember what you asked him?

"A The way I asked him was, 'Would you be willing to show me?'

"* * * * *

"Q When you said, 'Would you be willing to show me,' what did he do?

"A He showed me the pills."

[15] Maloney further testified that

"When Officer Kemper came over * * * I asked [defendant] to show her the pills that he showed me because he had put them back in his pocket and he opened his coat to get the pills."

[16] Although the second consent revealed information implicating defendant in possible illegal activity (unlawful possession of controlled substances), the dissent finds no exploitation in securing that consent, apparently because it believes that the initial consent was lawful.

such information. *See Williamson*, 307 Or at 623 (marijuana odor); *Land*, 106 Or App at 134 (odor of "growing marijuana"); *Martin*, 124 Or App at 461 (packets of methamphetamine). Yet *Quinn* involved the discovery of women's underwear, 290 Or at 387, which by itself does not indicate illegal activity. Furthermore, there is no indication that our analysis in *Martin* turned on the *illegal nature* of the information discovered.

The dissent's dissatisfaction with our analysis stems from what it perceives as "the uncertainty as to how to determine whether the information gained during the unlawful police conduct provided the *reason* for the officer's request for consent to search." 139 Or App at 540 (emphasis in original). That concern is unfounded. The inquiry we frame includes factual and legal elements whose resolution is not qualitatively different from, or more difficult than, other such questions that we routinely review.

The dissent nonetheless contends that, by ignoring the nature of the information revealed, our analysis is no different from the "but for" test rejected in *Rodriquez*, because "*all* consents given after unlawful police conduct could be the product of exploitation." 139 Or App at 540 (emphasis in original). That is not true.

In both *Rodriguez* and *Land*, official misconduct did not invalidate the subsequently obtained consents because consent was requested for reasons *independent* of the prior unlawful conduct. *See Rodriguez*, 317 Or at 29 (INS agent apparently predisposed to ask for consent, regardless of allegedly illegal arrest); *Land*, 106 Or App at 137 (illegal entry did not prompt request for consent, because officers had detected marijuana odor *before* illegally entering defendant's garage). Contrary to the dissent's concerns, it is easy to imagine a situation in which police misconduct does not focus attention on a defendant or prompt officers to seek consent. *See also State v. Mercado*, 105 Or App 582, 584, 586, 805 P2d 744, *rev den* 311 Or 482 (1991) (no exploitation of allegedly illegal "stop" in obtaining consent, where trooper suspected defendant of drug trafficking before stop ever occurred).

We conclude from the record that Maloney's illegal frisk prompted him to ask defendant to produce and open the metal container. *See* note 13. Under the above analysis, that constitutes exploitation. Because the prescription pills discovered as a result caused Maloney to ask defendant to show the container to Kemper, *see* note 14, the second consent was obtained through exploitation of the first. Because defendant's compliance with Maloney's second request necessarily involved opening his jacket, the odor of methamphetamine was obtained through an invalid consent. We hold that the methamphetamine discovered as a result should have been excluded and that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded for new trial.

**DEITS, P. J.,** concurring in part; dissenting in part.

I agree with the majority's conclusion that Maloney's frisk of defendant was unlawful. However, because I believe that Maloney did not exploit his prior unlawful conduct in obtaining defendant's consent to search, I would affirm the trial court's denial of defendant's motion to suppress.

The majority has done an excellent job of formulating the proper exploitation analysis under the existing case law, which is less than precise. I agree with the majority's formulation to the extent that it concludes that exploitation occurs when the police, through unlawful conduct, obtain information that focuses their attention on the defendant and prompts them to seek consent to a search. My difference with the majority is in our understanding of what constitutes "prompting" under the test. In my view, the majority's understanding of the term eliminates the distinction set forth in *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), between a mere "but for" causal connection and exploitation. Thus, the majority's position threatens to eliminate the rule, embodied in *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981), that prior unlawful police conduct does not automatically render inadmissible any evidence discovered during a subsequent consent search.

In my view, a proper application of the exploitation test must take into consideration the nature of the information gained during the officer's unlawful conduct. I believe that we can conclude that exploitation exists only when, under the particular circumstances of the case, the information disclosed by the unlawful police conduct implicates in some way the defendant's possible involvement in illegal activities. Because the information gained by Maloney during his unjustified frisk was completely innocent and did not implicate defendant in any way in illegal activities, I would hold that his consent was not the product of exploitation.

In *Rodriguez*, the court explained the distinction between a mere causal connection and "exploitation":

"Whether suppression is required in any such case will * * * depend on the nature of the connection between the unlawful police conduct and the evidence sought to be suppressed. As we have noted previously, evidence is subject to suppression in a criminal prosecution if it was *obtained in violation* of a defendant's rights under [Article I, section 9]' *State v. Davis, supra*, 313 Or at 253 (emphasis supplied). Under that standard, there will have to be, at the very least, a causal connection between the unlawful police conduct and the evidence uncovered during the subsequent consent search * * *.

"A causal connection alone, however, still is not sufficient to require suppression. This court has rejected the so-called 'but for' test, which would require the suppression of any evidence that would not have been discovered 'but for' the unlawful conduct. *State v. Quinn*, 290 Or 383, 394-97, 623 P2d 630 (1981); *State v. Kennedy*, 290 Or 493, 500-01, 624 P2d 99 (1981). *Thus, the fact that 'but for' the unlawful conduct, the police would not have been in a position to (for example) seek a person's consent does not, in and of itself, render any evidence uncovered during the ensuing consent search inadmissible.*

"In what circumstances, then, does unlawful police conduct render evidence obtained in a later consent search inadmissible, where the consent to the search is voluntary? We think that evidence obtained during such a search should be suppressed only in those cases where the police have exploited their prior unlawful conduct to obtain that consent. Only where such exploitation occurs can it be said

that the evidence discovered subsequently was 'obtained in violation' of a defendant's rights under Article I, section 9." *Rodriguez*, 317 Or at 39-40 (emphasis supplied).

As mentioned above, I think that the majority's understanding of the exploitation analysis does away with the difference between mere "but for" causation and exploitation. The majority attempts to explain the difference by stating that "but for" causation "give[s] police * * * the *opportunity* to seek consent," while prompting, as part of the exploitation test, "provide[s] a *reason* for doing so." *Stanley*, 139 Or App at 534 (emphasis in original). That explanation is unsatisfactory, however, because it does little more than answer the question with another question. We are still left with uncertainty as to how to determine whether the information gained during the unlawful police conduct provided the *reason* for the officer's request for consent to search. Unfortunately, the majority's application of the exploitation test to the facts here fails to demonstrate how that inquiry is to be made. The majority's application of the exploitation test provides no guidance as to when permissible "but for" causation becomes exploitative "prompting."

That lack of guidance threatens to do more than just produce confusion for the bench and bar; it also threatens to eviscerate the rule, embodied in *Kennedy*, that prior unlawful police conduct does not automatically render inadmissible any evidence discovered during a subsequent consent search. The majority states:

"[W]e conclude that the illegal frisk revealed information — the container's presence in defendant's pocket — that focused Maloney's attention on defendant and prompted him to request consent to search." *Stanley*, 139 Or App at 536.

The majority clearly implies that a consent to search will be the result of exploitation anytime that it follows unlawful police conduct that has yielded *any* information. However, it is difficult to imagine an encounter between a police officer and a defendant that will not yield some information to the officer's trained eye. By ignoring the need to analyze the nature of that information and the likely role that it played in the officer's decision to seek consent to a search,

the majority creates a situation where *all* consents given after unlawful police conduct could be the product of exploitation, thus completely undermining *Kennedy*.

In my view, to make a principled determination as to whether information gained during unlawful conduct "prompted" the officer's request for consent, the analysis must take into consideration the nature of the information. Exploitation has been found consistently when the unlawful police conduct disclosed information that, under the circumstances,[1] implicated in any way a defendant's possible involvement in illegal activities.[2] When an officer's unlawful conduct discloses such information, a court may readily conclude that that discovery prompted the officer to seek consent to a search and, consequently, that exploitation occurred.

*State v. Martin*, 124 Or App 459, 863 P2d 1276 (1993), is illustrative. In that case, an officer noticed a parked car in a convenience store parking lot. The defendant was slumped over the steering wheel, but the engine was running and the lights were on. Out of concern for the defendant's safety, the officer approached the car and knocked on the window. When the defendant did not

---

[1] The majority points to *Quinn* as a case in which exploitation should have been found, but asserts that the evidence discovered during the unlawful police activity — women's underwear — "by itself does not indicate illegal activity." 139 Or App at 537. However, under my approach, the determination as to whether or not there is any indication of possible criminal activities certainly must consider the circumstances in which the information is found. The discovery of women's underwear in the defendant's car *under the circumstances* of *Quinn* clearly implicated the defendant's involvement in criminal activities, *i.e.*, residential burglaries or even murder of an elderly woman. Thus, the majority's and Justice Gillette's (*see State v. Weaver*, 319 Or 212, 874 P2d 1322 (1994) (Gillette, J., concurring)) view of *Quinn* is not inconsistent with my exploitation analysis.

[2] *See State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993) (no exploitation where police found no evidence of illegal activity during presumptively illegal arrest); *State v. Williamson*, 307 Or 621, 772 P2d 404 (1989) (exploitation where police detected the smell of marijuana emanating from truck stopped at illegal roadblock); *State v. Wilkinson*, 132 Or App 531, 889 P2d 351 (1995) (no exploitation where police found no evidence of illegal activity during illegal arrest); *State v. Martin*, 124 Or App 459, 863 P2d 1276 (1993) (exploitation where police found methamphetamine during illegal search); *State v. Land*, 106 Or App 131, 806 P2d 1156 (1991) (no exploitation where illegal entry by police onto defendant's premises did not yield evidence of illegal activity); *but see State v. Quinn*, 290 Or 383, 623 P2d 630 (1981) (no exploitation even though police found evidence that, under the circumstances, indicated illegal activity); *State v. Jeffers*, 125 Or App 596, 866 P2d 486 (1994) (same).

respond, the officer opened the car door and reached in and shook him. The officer immediately noticed that the defendant's breath smelled of alcohol, his eyes were watery and bloodshot, and he was incoherent. The officer then arrested the defendant for DUII, handcuffed him, and conducted a "routine search incident to an arrest," which disclosed a Dristan tin. The officer concluded that the contents of the tin did not sound like tablets, so she opened it and discovered methamphetamine. The Defendant was placed in a patrol car and given *Miranda* warnings. Another officer asked the defendant for consent to search his car, and the defendant replied affirmatively. After obtaining consent, the arresting officer went to the defendant's car and seized a paper bag. She opened it and saw a box with a picture of some scales of a type that she testified were commonly used to weigh contraband. She then asked the defendant if the bag contained "more drugs," and he said that it did and gave her permission to search the contents. The officer then discovered more methamphetamine.

The trial court held, and we agreed, that the officer's opening of the Dristan tin was unlawful. The defendant then argued that the evidence of the methamphetamine found in the bag must be suppressed, because the officer obtained it by exploiting her prior unlawful conduct. We agreed:

> "In this case, the officer had discovered methamphetamine during the illegal search incident to arrest. Defendant was handcuffed, placed in the back of a patrol car and had been asked several questions about the contents of the Dristan tin. The officer then confronted him with the paper bag and asked if it contained *more* drugs. There is a direct connection between asking that question and the fact that the officer had illegally discovered methamphetamine in the earlier search. We conclude that the methamphetamine and scales discovered in the bag must be suppressed, because the police obtained them by trading on evidence that they had only as a result of the illegal search incident to arrest."
> *Id.* at 467 (emphasis in original).

In *Martin*, the officer's exploitation of her prior unlawful conduct was apparent. Before asking the defendant for consent to search the paper bag and whether it contained "more drugs," the officer had illegally seized

from the defendant evidence of methamphetamine. We could easily conclude that finding methamphetamine — evidence that implicated the defendant's involvement in illegal activity — prompted her to seek the defendant's consent to an additional search. Maloney's conduct here was materially different, in that his unlawful frisk revealed only an innocuous metal container, not evidence of a crime or any other information that would reasonably indicate that defendant was involved in illegal activities. Indeed, after feeling the object, Maloney did not even seize it. In that respect, Maloney's conduct was no different from that of the officers in *Rodriguez*, who, but for their unlawful conduct, would not have been standing in the door of the defendant's apartment. As in that case, suppression is not mandated simply because of the mere fact that, "but for" his prior unlawful conduct, Maloney would not have been in a position to ask for defendant's consent to a search.[3]

Analyzing the nature of the information discovered during the officer's unlawful conduct provides a principled way to determine whether that information could have "prompted" the officer's request for consent. Such an inquiry, unlike the majority's broad, conclusory approach, preserves the rule of *Kennedy* that prior unlawful police conduct does not automatically render inadmissible any evidence discovered during a subsequent consent search. It also preserves the distinction, formulated in *Rodriguez*, between mere "but for" causation and exploitation. I believe that Maloney's request for consent here was not "prompted" by his discovery of an innocuous metal container. Thus, in my view, the court properly denied defendant's motion to suppress. Accordingly, I dissent.

---

[3] I agree with the majority that our holding in *State v. Jeffers*, 125 Or App 596, 866 P2d 486 (1994) is questionable. In that case, the police obtained, through their unlawful conduct, information of criminal activities that precipitated their seeking the defendant's consent to a search.