Argued and submitted July 17, reversed and remanded August 28, 1996

# STATE OF OREGON,
## *Appellant,*

*v.*

# FREDERICK WENGER, JR.,
## *Respondent.*

## (9505-33842; CA A90389)

922 P2d 1248

David B. Thompson, Assistant Attorney General, argued the cause for appellant. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Bruce M. Howlett waived appearance for respondent.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

## DEITS, P. J.

The state appeals from a pretrial order suppressing evidence of controlled substances and a large sum of cash. ORS 138.060(3). We reverse.

We quote the material facts, which are undisputed, from the trial court's order:

"1.   On May 24, 1995, around 7:15 PM, Multnomah Co. Deputy Sheriff Brian Martinek was parked in a parking lot at SE 67th & Foster. He was there for the purpose of continuing to investigate a narcotics case that is unrelated to this case. He was meeting with his informer and they were both seated in his truck.

"2.   The parking lot at 67th & Foster is a 'high drug' area well known to the Sheriff's office as a place where narcotics of all kinds are bought and sold.

"3.   As Deputy Martinek and his informer talked, a maroon pickup truck drove into the parking lot and parked behind Martinek's vehicle about 15 feet away. The deputy saw the vehicle and saw that two men were inside it. A short time later the informer said to the deputy that she thought the two men were engaged in a drug transaction. The deputy turned around and saw some furtive movement that, based on his experience and training, caused him to think that a drug transaction was occurring. All he could see, however, were the upper arms, shoulders and heads of the two men. He saw the two men bend over toward each other and he saw some slight arm movements. Even though he saw nothing exchanged between the men, nor saw either put anything in their pockets, he concluded that a drug transaction was occurring.

"4.   Deputy Martinek radioed to other police vehicles that were in the neighborhood standing by ready to cover any situation that might arise. While he was talking on the radio to Deputy Biles, the passenger in the maroon pickup (who later turned out to be defendant) got out of the truck and walked away. The pickup drove off. The deputy advised other deputies of the description of the pickup and the direction in which it was traveling. The informer in the deputy's truck then got out of the truck and left the area.

"5. Deputy Martinek drove his vehicle to another area of the parking lot where he continued to watch defendant until his cover officers arrived. He watched defendant meet at least 2 or 3 other persons going to and from a laundry, including a young woman who later turned out to be defendant's girlfriend. The people split up and went in different directions. As they did, Deputy Biles arrived in his vehicle. Deputy Martinek briefed Deputy Biles on what had occurred.

"6. The deputies then positioned their vehicles adjacent to defendant's van and his girlfriend's car so that neither could leave the parking lot * * *.

"7. The police vehicles were unmarked. The officers were dressed in civilian clothes and were operating in an undercover capacity. No weapons were displayed.

"8. The officers approached defendant and Ms. Hindman. They identified themselves and showed their badges to defendant and to her. Deputy Biles placed his hand on defendant's shoulder and directed defendant away from his girlfriend so that he could talk with defendant confidentially. Deputy Biles explained to defendant why police were contacting him, explained the purported drug transaction, and asked for consent to search defendant's person. Defendant refused.

"9. Officer Biles was uncertain what to do next, so he then guided defendant back toward Deputy Martinek and Ms. Hindman. There the two officers stood in positions that placed defendant between themselves and Deputy Martinek's truck. Further questions occurred. Defendant continued to refuse consent to search both his person and his vehicle.

"10. As this was occurring the deputies received a radio broadcast from Deputy Shanks who indicated that he had located the maroon pickup, had stopped it, had talked to the driver, and the driver had admitted to buying marijuana from defendant. Defendant heard this broadcast and denied involvement in the transaction. He again asserted that he did not have drugs on his person.

"11. Based upon the radio information from Deputy Shanks, the deputies arrested defendant, handcuffed him, and gave him *Miranda* advice. They then conducted a search incident to that arrest. They found a small quantity

of marijuana in one of his pockets. In another they found four $20 bills. In a third pocket they found approximately $400 in cash.

"12. Police questioned defendant about what they had found. Defendant denied conducting a sale. Rather, he said that he had bought marijuana from the driver of the maroon pickup. He explained that the large amount of cash was from 'work.'

"13. Because of the four $20 bills, the deputies radioed back to Deputy Shanks to ask how the marijuana had been purchased from defendant. The driver of the vehicle said that he had purchased the marijuana with four $20 bills. Defendant heard this broadcast.

"14. Eventually defendant gave consent to search his van. He pointed out a metal box that enclosed a clipboard. The clipboard container was approximately 8-1/2 x 11 x 1 inches in size. Defendant told police they would find marijuana inside it, and they did."

Before trial, defendant moved to suppress the evidence discovered during the search of his person and his vehicle on the ground that he was unlawfully stopped. The state argued that defendant had not been stopped. Alternatively, it argued that any stop of defendant had been based on reasonable suspicion. The state also argued that an unlawful stop of defendant was immaterial, because the search of his person was incident to a lawful arrest and the search of the van was pursuant to a valid consent.

The trial court granted defendant's motion to suppress. The trial court first concluded that defendant was unlawfully stopped:

"Although the State contends that the officers simply approached defendant and his girlfriend to talk with them and that thus there was no 'stop,' the State conceded that if the deputies used their vehicles to block defendant's van and his girlfriend's car so that they could not leave the parking lot, then a stop occurred. Having found factually that the deputies indeed did block the vehicles, there was a stop as defined by ORS 131.615.

"Although the officer had a suspicion that defendant was involved in a narcotics transaction, because of his prior

training and experience, the State produced no evidence on this point other than the deputy's conclusory opinion. The opinion was unsupported by specific factual information. The objective evidence produced at the hearing shows that the deputy had no more than a 'hunch' that a crime was occurring. He could see some slight movement within the vehicle, but he could see very little of the bodies of the two men, he saw nothing exchanged between the two men, and he did not see either of the two men appear to place anything in their pockets. That is insufficient to establish reasonable suspicion to support a stop." (Citations omitted.)

The trial court then determined that the evidence gathered during the search of defendant's person and vehicle must be suppressed as the fruits of the unlawful stop:

"The next question is whether there was a valid search incident to arrest. Police detained defendant and his girlfriend and subjected them to questioning until the time when a radio broadcast from Deputy Shanks provided probable cause for an arrest. However, the detention of defendant and Ms. Hindman was 'exploitation' of the prior unlawful stop and thus is subject to the exclusionary rule.

"The final question is whether there was a valid consent by defendant for police to search his van. Although defendant did voluntarily consent and did take police over to his van and point out where the marijuana was hidden, which conduct shows consent, nevertheless the consent was obtained directly through the continuing police 'exploitation' of the initial unlawful stop. Therefore defendant's consent to the search of his van, while voluntary factually, is not voluntary legally, and is therefore subject to the exclusionary rule." (Citations omitted.)

The state assigns error to the trial court's decision to suppress the evidence of marijuana and cash found pursuant to the search of defendant's person and his vehicle. The state first argues that the officers' interaction with defendant was not a stop but, instead, a mere encounter. Alternatively, the state argues that the court erred in suppressing the marijuana and cash as fruits of an unlawful stop. Defendant waived appearance on appeal.

We first address whether the officers stopped defendant. Our standard of review for search and seizure cases is

set forth in *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993):

> "Determination of the legality of searches and seizures depends largely on the facts of each case. *State v. Warner*, 284 Or 147, 149, 585 P2d 681 (1978). What actually happened is a question of fact for the trial court. A trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings. *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). Our function is to decide whether the trial court applied legal principles correctly to those facts. *State v. Davis*, 295 Or 227, 238, 666 P2d 802 (1983)."

Our task here is to determine whether the trial court's findings of fact, which are uncontested, support its conclusion that defendant was stopped.

ORS 131.605(5) defines a stop as "a temporary restraint of a person's liberty by a peace officer lawfully present in any place." A stop, as defined by ORS 131.605(5) is a seizure under Article I, section 9, of the Oregon Constitution. *State v. Holmes*, 311 Or 400, 408 n 18, 813 P2d 28 (1991). A seizure of a person occurs under Article I, section 9, of the Oregon Constitution

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *Id.* at 409-10.

Because the searches here proceeded without a warrant, the state has the burden of establishing their lawfulness. *State v. Miller*, 269 Or 328, 524 P2d 1399 (1974).

We conclude that, under the totality of the circumstances, defendant was stopped. The record shows that defendant's vehicle was parked directly behind his girlfriend's vehicle in the parking lot. Other vehicles were parked to the sides of their vehicles. After watching defendant and his girlfriend approach their parked vehicles, Martinek and Biles decided to initiate contact. They did so by one officer parking his vehicle directly in front of defendant's girlfriend's vehicle and the other officer parking his vehicle

directly behind defendant's, thereby completely preventing defendant from driving away. Biles approached defendant, identified himself, and then placed his hand on defendant's shoulder and physically directed him to the back of defendant's vehicle for questioning.

We have held that "when an officer's vehicle blocks a vehicle in a manner that would prevent it from being driven away, a stop occurs." *State v. Mesenbrink*, 106 Or App 306, 807 P2d 319, *rev den* 312 Or 235 (1991); *State v. Greer*, 93 Or App 409, 763 P2d 158 (1988). The trial court expressly found that the officers positioned their vehicles so as to completely block defendant's exit in his vehicle. The state argues, relying on *State v. Cordray*, 91 Or App 436, 755 P2d 735 (1988) and *State v. Porter*, 38 Or App 169, 589 P2d 1156 (1979), that that conduct did not amount to a stop because "there is no indication that defendant intended to leave the area in either of the blocked vehicles when the officers approached him."

We do not agree with the state's characterization of the record. Defendant and his girlfriend had walked across the parking lot and were next to their vehicles when the officers blocked them in. Both defendant and his girlfriend testified that when the officers approached, they were going to leave in their vehicles to go have a drink. The trial court did not make express findings on that point. However, under *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968), where there is sufficient evidence in the record, we presume that the trial court decided the facts consistent with its ultimate conclusion. Thus, the fact that the officers blocked defendant's exit in his vehicle supports the trial court's conclusion that he was stopped.

That conclusion is also supported by the trial court's finding that "Deputy Biles placed his hand on defendant's shoulder and directed defendant away from his girlfriend so that he could talk with defendant confidentially." A stop may occur when, during the course of an encounter, an officer requires a defendant to alter his or her course of conduct. *State v. Johnson*, 105 Or App 587, 805 P2d 747 (1991); *State v. Canape*, 46 Or App 453, 611 P2d 1190 (1980). Here, Biles *physically* directed defendant to the back of his girlfriend's car. That conduct, together with the blocking of defendant's

vehicle, was not only a show of authority sufficient to lead defendant to reasonably believe that he was not free to leave, *Johnson*, but was also an actual intentional deprivation of defendant's freedom of movement. *Holmes*. We therefore conclude that the trial court properly determined that, under the totality of the circumstances, defendant was stopped.

■ The state does not dispute that, if the encounter was a stop, it was not based on reasonable suspicion. The state argues, however, that the trial court erred in suppressing the evidence as tainted fruit of the unlawful stop. In particular, the state argues that the trial court erred in concluding that defendant's arrest, his search incident thereto, and the subsequent consent search of his vehicle were the products of exploitation of the unlawful stop. *See State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993). We agree.

■ Exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts the officer to conduct a search. *State v. Stanley*, 139 Or App 526, 535, 912 P2d 948, *rev allowed* 323 Or 690 (1996). There is no evidence that the officers' unlawful conduct here revealed any information that led to defendant's arrest and search incident thereto or the subsequent consent search of his vehicle. Defendant's arrest was prompted by Shanks' message to Biles and Martinek that the driver of the maroon pickup claimed to have just purchased marijuana from defendant. It is true that Martinek and Biles were able to arrest defendant immediately, because he was unlawfully stopped at the time. However, the unlawful stop, itself, did not reveal to the officers the information that defendant had just completed a drug transaction. That information was gained independently by Shanks, and could therefore provided untainted probable cause for defendant's arrest. *See State v. Davis*, 295 Or 227, 243, 666 P2d 802 (1983) (products of search incident to arrest must be suppressed where probable cause for arrest stems solely from unlawful police conduct). Defendant does not contend that the officers lacked probable cause to arrest him or that his search incident thereto was somehow improper. We therefore conclude that the search incident to defendant's arrest did not result from exploitation of the unlawful stop.

■ We also conclude that defendant's consent to the search of his vehicle was not the result of exploitation of the unlawful stop. The officers were not prompted to seek his consent to the search by any information gained from defendant during the unlawful stop. Instead, they were prompted to seek his consent to a search of the van by the evidence of the marijuana and cash that they discovered during the lawful search of his person incident to his arrest. Accordingly, the trial court erred in granting defendant's motion to suppress.

Reversed and remanded.