Argued and submitted December 21, 2001; resubmitted en banc June 11, reversed and remanded July 31, 2002

## STATE OF OREGON,
### *Respondent,*

*v.*

## DAVID CLYDE HALL,
### *Appellant.*

## 9701546CR; A109813

50 P3d 1258

Louis R. Miles, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler and Brewer, Judges.

EDMONDS, J.

Brewer, J., concurring.

Deits, C. J., dissenting.

## EDMONDS, J.

Defendant appeals from a conviction for possession of a controlled substance. ORS 475.992(4)(b). He assigns as error the trial court's denial of his motion to suppress evidence that was seized from his pocket during an allegedly unlawful stop. He also assigns as error the denial of his motion to dismiss for lack of a speedy trial. We are not persuaded by defendant's argument that the case should be dismissed for lack of a speedy trial under ORS 135.747. Suffice it to say that defendant himself contributed to much of the delay. *See State v. Jenkins*, 29 Or App 751, 756, 565 P2d 758 (1977) ("The defendant cannot take advantage of delays caused by his own conduct whether or not the delays were justified."). However, we reverse on the basis of defendant's first assignment of error.

In regard to the seizure of evidence from defendant's person, the trial court made, in substance, the following findings. Defendant was walking along Washington Street near 10th Street in Klamath Falls toward the location where he had stored his backpack. Officer Deese, in a marked patrol car, drove past defendant, going in the opposite direction. Deese did not recognize defendant, nor did he see anything about defendant's conduct that would justify a reasonable suspicion of criminal activity. Deese noticed that defendant looked at him and then looked away. He also saw in his rearview mirror that defendant turned to look at the police car about four more times after the patrol car passed him. Deese turned his vehicle around and drove back to where defendant was walking. He stopped his car near defendant and signaled with two fingers of his hand for defendant to come toward him.[1] Defendant stopped walking and turned toward Deese. Deese got out of his car, said "Excuse me," and asked defendant if he had any identification. Defendant gave Deese an Oregon identification card. Deese radioed the information from the card to a dispatcher, using a shoulder radio, and then returned the card to defendant.[2] The record check on

---

[1] Defendant testified that "Deese was still in the car just flagging me over[,] so I started to walk over to the car[.]"

[2] It is unclear when Deese heard from the dispatcher regarding the result of the record check. In the pretrial hearing, Deese testified that the record check was

defendant's identification card provided no basis for a restraint of defendant's liberty. While waiting for the record check, Deese noticed that defendant was wearing a jacket that "looked like it had items inside of it." Deese asked defendant if he had any knives, weapons, or drugs, and defendant said, "No." Deese then asked, "Would you mind if I checked?" Defendant said, "Okay." Deese then did a quick patdown and found no weapons. He did, however, find a small glass vial, which later proved to contain traces of amphetamine.[3] The evidence obtained from the search of defendant's pocket led to defendant's conviction that is before us now on appeal.

Before trial, defendant moved to suppress the evidence of the vial and its contents.[4] In his motion, he argued that Deese's gesture when he "signaled with two fingers of his hand for the defendant to come in his direction" was "an unlawful stop because there was no reasonable suspicion to justify it" and that the seizure and subsequent search of the glass vial "constituted exploitation of the unlawful stop." The state responded:

"[T]his is not a stop. It was merely an encounter[.] [T]he officer pulled the vehicle in near the Defendant or next to him and did not stop the Defendant's travel. The vehicle didn't stop him, there were no orders given to the Defendant. * * * And in this case I think it is important the officer did not retain the Defendant's identification, he looked at it, he called in the name and then he immediately gave it back.

not reported back to him until after he had asked to search defendant for weapons. In his trial testimony, Deese indicated that he called to request the record check and that he had the results of the record check "shortly thereafter."

[3] Defendant testified:

"I had my coat zipped shut and I had my gloves on and they were slightly hanging out. He says, 'That bulge in your coat is making me a little nervous. What do [you] got, do you got any guns or drugs in there?' I said, 'no, they're my gloves.' As soon as I pulled my gloves out like this he immediately grabbed me and was checking the insides of my pockets. I didn't want to, you know, get his hands out, I didn't know what to do, I was afraid I'd get a, you know, assault or resisting arrest or whatever and then he just kind of patted me down and he felt that vi[al] and goes, 'what's that?' I said, 'it's nothing.' He says, 'I want to see that "nothing." ' So I reached in and I gave him my, gave him that vi[al]."

[4] Procedurally, defendant was first indicted under case number 97-81-CR, and then the indictment was dismissed in that case. Defendant was again indicted in case number 97-1546, in which the conviction occurred. The ruling on the motion to suppress was made in 97-81-CR, but in 97-1546 the court took judicial notice of the record made in 97-81-CR and adhered to the ruling made therein.

> So the Defendant was not held in place because the officer had something that belonged to the Defendant. So overall, again the State's position is that if this was a stop it certainly, any evidence should be suppressed, but I don't think it was a stop. It was a mere encounter."

The trial court concluded that Deese's contact with defendant did not restrain defendant's liberty and that there were therefore no grounds for suppression of the evidence. It denied the motion to suppress, and defendant was ultimately convicted.

We are bound by the trial court's findings of fact if there is evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Here, there is evidence to support each finding. Therefore, the question presented by this appeal is legal in nature.[5] Generally, "[a] compelled stop of a person on a public road, of course, requires justification." *Nelson v. Lane County*, 304 Or 97, 101, 743 P2d 692 (1987). "Ours is not a society where police can stop any citizen and require the production of an 'identification card' without reason." *State v. Tourtillot*, 289 Or 845, 868, 618 P2d 423 (1980), *cert den* 451 US 972 (1981).[6] We have also acknowledged, however, that

> "[s]treet encounters between patrolling policemen and citizens call the most subtle aspects of the Fourth Amendment into play. * * *
>
> "The police have no less right than any other person to approach another and make inquiry regarding circumstances of interest. * * * The encounter becomes subject to the restrictions of the Fourth Amendment, however, when the citizen's freedom of movement is restricted or his right to privacy is intruded upon by the process of inquiry or as a development of an encounter which was initiated for noncriminal purposes. A holding of the person, no matter how minor, is a seizure within the meaning of the Fourth Amendment even though no arrest has occurred." *State v. Evans*, 16 Or App 189, 193-94, 517 P2d 1225 (1974).

---

[5] The state concedes that there was nothing in defendant's conduct or appearance that would have given the officer reason to suspect him of any crime.

[6] *See also State v. Smith*, 73 Or App 287, 698 P2d 973 (1985) (holding that the use of the defendant's identification to check for arrest warrants transformed a mere conversation with the defendant into a stop under ORS 136.615).

Thus, ultimately, this case presents a question of Deese's authority: whether he was lawfully authorized to act in the manner described above by some statute and whether his authority to do so, if any, is circumscribed by the state and federal constitutions.

We inquire initially whether Deese's actions were authorized by any statute. *State v. Amaya*, 176 Or App 35, 29 P3d 1177 (2001), *rev allowed* 334 Or 288 (2002) (if a statutory analysis is sufficient to resolve the legality of a restraint of liberty, a constitutional analysis is unnecessary). We are not aware of any statute that would authorize Deese's conduct, and the parties have not cited one to us. ORS 131.615 requires an officer to have reasonable suspicion before making a stop. ORS 810.410, which authorizes a stop of a pedestrian for pedestrian traffic violations, also requires reasonable suspicion that the pedestrian has committed a traffic infraction. Here, Deese had no reasonable suspicion of any criminal misconduct or traffic violations.

■ We turn to the state constitutional issue: whether Deese's actions violated Article I, section 9, of the Oregon Constitution. Stated another way, did Deese's conduct constitute a permissible citizen encounter or an unlawful seizure of defendant's person? In *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991), the Supreme Court explained the difference between a citizen encounter with a police officer and an unlawful seizure:

> "[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 *Search and Seizure, A Treatise on the Fourth Amendment* 413, § 9.2(h) (2d ed 1987).

Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

We applied the same rule in substance in *State v. Johnson*, 105 Or App 587, 590, 805 P2d 747 (1991), where we held that "[w]hat starts out as a police-citizen encounter may be converted into a stop by a show of authority." In *Johnson*, officers were present in an apartment complex because of a report of a fight in the parking lot. While in the lot, one officer encountered the defendant and asked him, in what we treated as a citizen encounter, whether he knew anything about the fight. The defendant answered in the negative, and nothing about his answer created a contrary suspicion. Notwithstanding that fact, the officer asked the defendant to come out from behind a bush and walk toward him. We held that, because the officer had already concluded his inquiry of the defendant about the fight that he was investigating, his subsequent exercise of authority over the defendant converted the citizen encounter into an unlawful stop. We focused on the totality of the circumstances surrounding the officer's conduct. We reasoned:

"The 15 feet that defendant walked toward the officers in response to [the officer's] request, which was away from the direction that he was walking, manifested the domination that [the officer] exercised. That show of authority converted the conversation into a stop." *Id.* at 590-91.

*Johnson* illustrates how a citizen encounter can become a restraint of liberty when an officer engages in conduct significantly beyond that acceptable in ordinary social intercourse. So too, when an officer told a citizen to "freeze," his liberty was deemed to have been restrained. *State v. Warner*, 284 Or 147, 167, 585 P2d 681 (1978). Similarly, a citizen can be deemed "stopped" if a police officer directs him to put identification on a table or to empty his pockets. *Id.* at 165-66. Those kinds of encounters do not bear the indicia of ordinary citizen encounters because of the officer's exercise of restraint over the person. Under *Holmes*, a seizure will occur

"whenever an individual believes that [a restraint on his liberty] has occurred and such belief is objectively reasonable in the circumstances." 311 Or at 409-10.

We turn to Deese's conduct in this case. There were three distinct acts that occurred before Deese asked for defendant's consent to search: (1) Deese's nonverbal gesture directing defendant to come toward him; (2) Deese's request for identification, his taking of defendant's identification card, and his use of it to run a record check; and (3) Deese's question to defendant about his possession of knives, weapons, or drugs. We acknowledge that, merely because an officer makes inquiries that a private citizen would not make, it does not follow that a person's liberty is restrained. Moreover, Deese's gesture, by itself, does not necessarily indicate that Deese was exercising his authority over defendant. It could have been merely a gesture to get defendant's attention—conduct that would occur in ordinary social intercourse between citizens. However, the conduct that followed the gesture persuades us that defendant's liberty was restrained, in light of the totality of the circumstances. Deese's request for defendant's identification, his question about knives or drugs, and his request to search defendant while they were waiting for the record check, when combined with his gesture to defendant, would cause a reasonable pedestrian to believe that the officer's conduct constituted more than ordinary social intercourse. Rather, it would suggest that the officer was exercising his authority in order to conduct a criminal investigation.[7] In that sense, this case is unlike *Holmes*, where the defendant was stopped so that the officer could advise him of a detour around an accident. This case is more like the contacts made in *Warner*.

Our conclusion is further supported by the holdings in two additional cases. In *State v. Painter*, 296 Or 422, 676 P2d 309 (1983), the officer encountered the defendant walking in the street in the middle of the night. He stopped him and first asked him what he was doing. The defendant

---

[7] *See, e.g., Smith,* 73 Or App at 292 (holding that "the use of defendant's identification to check for arrest warrants constituted a show of authority that would lead a reasonable citizen in defendant's circumstances to believe that he was not free to leave unless the warrant check came back clear[,]" even when the actual identification itself had been returned to the defendant).

replied that his car had broken down. Nonetheless, the officer then asked the defendant for identification and retained it while he ran a radio check. The officer frisked the defendant while waiting for the radio check to come back. Then, after the radio check had come back, the officer asked more questions before returning the identification. The court held that the retention of the identification under those circumstances constituted a restraint of the defendant's liberty.

In *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998), the defendant had been stopped for a traffic infraction, and his identification had been taken briefly. The identification was returned, and the officer told the defendant that he was free to leave. However, immediately afterward the officer asked if he could search the vehicle. He continued his requests, even though the defendant did not give consent after the first request. He also asked the defendant if he possessed any drugs. While the officer was questioning the defendant, another officer, who had prior drug-related contact with the defendant, approached the defendant and interrupted the conversation, asking the defendant two more times if he had any drugs in the vehicle. The court concluded that, regardless of the officer's authority to restrict the defendant's liberty initially, the officer's continuous exercise of authority went significantly beyond that acceptable in ordinary social intercourse and constituted a restraint of liberty. We believe that what occurred to defendant in this case is similar to the facts in *Painter* and *Toevs*. We conclude that defendant was unlawfully restrained before Deese asked for consent to search.

■ The remaining question is what effect Deese's unlawful restraint of defendant had on his consent to a search of his person. Defendant contends:

"The officer noticed the bulges in defendant's jacket only after the unlawful stop. This new information prompted the officer to inquire about weapons and drugs. * * * Under *State v. Stanley*, 139 Or App 526, 912 P2d 948 (1996), *rev'd on other grounds* 325 Or 239, 935 P2d 1202 (1997), this constituted exploitation of the unlawful stop. The unlawful stop and the new information about the jacket gave the officer not only the opportunity, but also the reason, to request defendant's consent."

The state responds:

> "The alleged illegality, *i.e.*, the stop itself, did not produce any evidence that the officer exploited. * * * Here, the alleged illegality (the stop) did not produce any incriminating evidence but merely put the police in a position to request consent."

The state relies on the reasoning in *State v. Peppard*, 172 Or App 311, 18 P3d 488, *vacated* 332 Or 630, 34 P3d 168 (2001), *on remand* 179 Or App 478, 40 P3d 563 (2002), which in turn relied on *State v. Arabzadeh*, 162 Or App 423, 986 P2d 736 (1999). Those cases both involved assertedly unlawful continuations of lawful traffic stops. After the initial traffic investigations were completed, the motorists were told that they were free to leave. Thereafter, the officers asked for consent to search. We held that, even assuming that the continuation of the stops was unlawful, the evidence gained after consensual searches was admissible if the officers did not "exploit any prior unlawful conduct," "trad[e] on the arrest or otherwise tak[e] advantage of it to obtain the consent." *Peppard*, 172 Or App at 315-16.

In this case, Deese testified he had not yet completed the process of running a record check on defendant's identification when he began the dialogue with defendant that led to his request for consent to search. He stated:

> "I carry my radio right here and I just called [the record check] in and handed [the identification card] back to him and then while I was waiting for dispatch to give me a response on his status[,] I asked him if he had any knives or weapons, illegal drugs on his person."

Deese also testified:

> "[Defendant] was wearing a leather jacket * * * and it kind of had some bulges towards the front that, that I, that caught my eye, I just thought that was kind of suspicious looking and I asked him at that time, when I noticed the bulges, I said, 'do you have any weapons, knives or drugs on you?' "

Unlike the circumstances in the cases relied on by the state, Deese's testimony demonstrates that he "exploited the illegal

restraint of defendant's liberty to obtain his consent to search."

Our conclusion is based on the Supreme Court's reasoning in *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993). In that case, government authorities went to the defendant's apartment after obtaining an administrative arrest warrant. When they arrived, they knocked on the door, and the defendant answered. He was advised that he was under arrest pursuant to the warrant. After he was arrested, he consented to a search of his apartment, which resulted in the discovery of guns and the subsequent prosecution of the defendant for the crimes of being a felon in possession of a firearm. At trial and on appeal, the legality of the arrest warrant was put in question. The Supreme Court held that, even if the arrest was unlawful, the seized guns were admissible in evidence because the police had not exploited their unlawful conduct in obtaining the defendant's consent to search the apartment.

In ruling on the issue of whether the police had exploited the prior illegality, the court made two important distinctions. First, the court explained that the issue was not one of voluntariness, an issue that focuses on the effect of unlawful police conduct on a defendant's state of mind. *See also State v. Weaver,* 319 Or 212, 219, 874 P2d 1322 (1994).[8] Second, the court discussed the type of connection that must be present between the unlawful police conduct and the evidence uncovered during the subsequent consent search. It observed that, where the evidence would have been seized in the absence of unlawful conduct and the discovery of the evidence was inevitable, "the mere fact that the evidence was obtained *after* that conduct will not require suppression." *Rodriguez,* 317 Or at 39 (emphasis in original). Similarly, a causal, "but for" connection alone is not sufficient. Thus, in

---

[8] In this case, the dissent says, "The proper focus under an exploitation analysis is not on why the officer acted but why the defendant consented." 183 Or App at 72 (Deits, C. J., dissenting). The dissent's position is clearly inconsistent with the reasoning in *Rodriguez* and *Weaver*. As we said in *State v. Stanley,* 139 Or App 526, 534, 912 P2d 948 (1996), "Unlike a 'voluntariness' analysis, which focuses on the person giving consent, the dispositive consideration in the 'exploitation' inquiry is the prior illegality's effect on the police." The dissent concedes as much elsewhere in its opinion when it correctly says that "exploitation concerns whether the police *took advantage* of the circumstances of their unlawful conduct." 183 Or App at 66 (Deits, C. J., dissenting) (emphasis in original).

*Rodriguez*, the fact that the officers were present at the defendant's apartment to serve the allegedly unlawful arrest warrant did not constitute exploitation of the illegal warrant. Rather, the court said that "[e]xploitation occurs when the police *take advantage* of the circumstances of their unlawful conduct to obtain the consent to search." *Rodriguez*, 317 Or at 40 (emphasis added). *See, e.g., State v. Williamson*, 307 Or 621, 772 P2d 404 (1989) (after smelling the odor of marijuana coming from the defendant's vehicle, the police took advantage of the restraint of liberty arising out of an unlawful roadblock to persuade the defendant to give his consent to search).

Here, Deese's testimony establishes that he took advantage of his unlawful stop of defendant to obtain defendant's consent to search. He had no reason for stopping defendant other than to conduct a criminal investigation. His detention of defendant was unsupported by a reasonable suspicion that defendant had committed any criminal offense. Although Deese's initial gesture could, under different circumstances, have constituted a mere request for a police-citizen encounter, the conduct that followed demonstrates that each successive action took advantage of the preceding circumstances to obtain defendant's consent to search. Deese stopped defendant to ask for identification without reasonable suspicion that he had committed a crime. After procuring defendant's identification and while waiting for the record check to be completed, he continued his criminal investigation by asking questions about weapons. During that time, he observed the bulges in defendant's jacket, and he expressly testified that his observation led him to request consent to search. Thus, Deese took advantage of the circumstances of his unlawful conduct to obtain defendant's consent, and it is that exploitation of the circumstances that distinguishes this case from the facts in *Peppard* and *Arabzadeh*. Consequently, the trial court erred in denying defendant's motion to suppress evidence seized as a result of the search.

The dissent would remand to the trial court so that it could determine whether Deese exploited the unlawful detention. With respect, there can be no other legal conclusion from Deese's own testimony than that he took advantage

of the circumstances of his unlawful conduct to obtain the consent to search. Therefore, remand on that ground is not required. Much of the dissent's quarrel in this case arises from its dissatisfaction with the majority's language in *State v. Stanley*, 139 Or App 526, 912 P2d 948 (1996), *rev'd on other grounds* 325 Or 239, 935 P2d 1202 (1997). Now, for a second time, the dissent urges that we disavow our language that "exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts them either to seek the defendant's consent or to ask questions leading to consent." *Stanley,* 139 Or App at 535. The dissent complains here that, "[u]nder the test as articulated in *Stanley,* it is difficult to imagine an encounter between a police officer and a defendant that will not yield some information to the officer's trained eye." 183 Or App at 71-72 (Deits, C. J., dissenting). It concludes that, under *Stanley*'s language, we have, in effect, resorted to a "but for" or mere causation test that was rejected in *Rodriguez*. Finally, it appears to reason that all that could exist here, under the trial court's findings, is mere causation between the illegal stop and Deese's observation of the bulge in defendant's pocket as, in its view, also occurred in *Stanley*.

We first point out that the facts in *Stanley* are different from the facts in this case. There, the police responded to a dispatch call of suspicious activities at a grocery store. The store personnel were concerned that the defendant was going to rob the store. The second officer, who responded immediately, frisked the defendant upon arrival and discovered a metal container that did not feel like a weapon. He asked the defendant for consent to search the container which, when opened, exposed to view three prescription pills. The officer allowed the defendant to keep the tin and drugs. Later, the officer asked the defendant to show the container and pills to another officer, and in the course of complying, the defendant exuded an odor of controlled substances that the officers had not otherwise noticed. That odor led to the defendant's arrest and search, which revealed controlled substances for which the defendant was prosecuted. Our statement about which the dissent complains was made in the context of reasoning that the officer exploited the unlawful frisk "because there is 'a direct connection' between asking defendant to produce the

container and the fact that [the officer] had conducted an illegal frisk." *Stanley*, 139 Or at 535-36. Our statement about which the dissent complains was intended only to put the *Rodriguez* test in the context of the facts in *Stanley*.

Beyond that observation, the dissent misses the point in both *Stanley* and in this case. Contrary to its concern that observations by officers during encounters with citizens will lead invariably to suppression of evidence under the majority view, both this case and *Stanley* involve facts where the officers admittedly took advantage of the circumstances of their unlawful conduct (the frisk in *Stanley* and the illegal stop here) by trading on or exploiting the information learned to obtain consents to search, much in the same manner as the police traded on the odor of the marijuana detected as a result of their illegal roadblock in *Williamson*. In each case, the officers *used* the information to their advantage. That type of "use" of information by the police to obtain an advantage will not necessarily occur in every situation where it turns out that initial police presence or conduct was unlawful. For instance, those kinds of facts were absent in *Rodriguez* where the illegality of the warrant was unrelated to the request for consent to search and no fact learned during the warrant's execution prompted the request. *See also State v. Wenger*, 143 Or App 90, 99, 922 P2d 1248 (1996); *State v. Land*, 106 Or App 131, 806 P2d 1156 (1991). Here, Deese took advantage of an unlawful stop to make an observation of a "suspicious bulge" that in turn *prompted* his question, "do you have any weapons, knives or drugs on you?" The answer to that inquiry led to the request for consent to search, and was a clear exploitation of the prior illegality that began when Deese gestured for defendant to approach him. Consequently, the trial court erred in denying defendant's motion to suppress evidence seized as a result of defendant's consent.

Reversed and remanded.

**BREWER, J.,** concurring.

A critical tension point between the majority and dissenting opinions is the importance, if any, to an exploitation analysis of a causal link between a defendant's consent to a search and his knowledge that the police had discovered

information that would not have been obtained "but for" unlawful police conduct. The majority gives little, if any, weight to such knowledge. 183 Or App at 58 n 8. The dissent, on the other hand, appears to believe that exploitation can occur only if the facts "demonstrate that a substantial factor in defendant's decision to consent was his knowledge that [the police] had discovered information during the unlawful stop." *Id.* at 74 (Deits, C. J., dissenting).

I agree with the dissent that, although the issue is not one of voluntariness, a defendant's reasons for giving consent to a search may be relevant to an exploitation analysis. It is not uncommon for a defendant's knowledge that the police had obtained information to affect the decision to give consent. The existence of such knowledge logically can contribute to a determination that the police took advantage of unlawful conduct. However, its absence is not dispositive. In some instances, the causal link between unlawful police conduct and giving consent may be so strong that the conclusion that the police took advantage of the unlawful conduct is inescapable, irrespective of whether the defendant knew, in giving consent, that the police had acquired any information that led to the request for consent. *See, e.g., State v. Weaver*, 319 Or 212, 224, 874 P2d 1322 (1994) (Gillette, J., concurring). As explained by the majority, that is the case here. 183 Or App at 61. Accordingly, I join in the majority opinion and concur.

**DEITS, C. J.,** dissenting.

I agree with the majority that the officer unlawfully stopped defendant without reasonable suspicion. The majority goes on, however, to conclude that the evidence obtained by the police during the stop must be suppressed because the police exploited that illegality to obtain the evidence. For the reasons that I will explain, I do not believe that the majority correctly defines or applies the concept of "exploitation." The majority essentially uses the concept of exploitation as articulated in *State v. Stanley*, 139 Or App 526, 912 P2d 948 (1996), *rev'd on other grounds* 325 Or 239, 935 P2d 1202 (1997). We stated in *Stanley* that "exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts them either to

seek the defendant's consent or to ask questions leading to consent." 139 Or App at 535. In my view, the test in *Stanley* is incomplete and to a certain extent inaccurate as stated. As I will discuss, a close look at our case law demonstrates that the concept of "exploitation" is more complex. To the extent that our discussion in *Stanley* states otherwise, I would disavow the language in *Stanley*. After applying what I believe to be the correct test for exploitation, I would remand this case to the trial court so that it may make pertinent factual findings and address the legal question of whether those facts demonstrate that exploitation occurred. Accordingly, I respectfully dissent.

Any meaningful discussion of exploitation under Oregon law must begin with the Supreme Court's decision in *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993). In that case, the Supreme Court addressed the issue of the admissibility of evidence seized during a consent search that followed unlawful police conduct. The court reasoned that a defendant's rights under Article I, section 9, of the Oregon Constitution, are vindicated through the sanction of suppression. *Rodriguez*, 317 Or at 33, 39. It concluded that, where evidence is discovered during a consent search that follows unlawful police conduct, suppression is required to vindicate a defendant's rights under Article I, section 9, in two circumstances: (1) the defendant's consent is involuntary or (2) the police exploit the unlawful conduct to obtain the defendant's consent. *Rodriguez*, 317 Or at 39-40. In distinguishing the issue of voluntariness from exploitation the court explained:

> "In some cases, the unlawful conduct may bear on the issue of voluntariness. That is, the unlawful conduct may have some effect on the state of mind of the person giving the consent, affecting whether the consent is a voluntary act of that person's free will. Where the unlawful conduct bears on the voluntariness of the consent, as in any other case where voluntariness is at issue, the state must prove by a preponderance of the evidence that the consent was voluntary. * * *
>
> "Where, as here, the question of the voluntariness of the consent has not been raised, or where the court has determined that the consent was voluntary, unlawful police conduct occurring before a consent search still may affect the

admissibility of evidence seized during that search. This is so because that unlawful conduct—either an unreasonable search or an unreasonable seizure—occurring before the consent search was a violation of the defendant's rights, even if the consent search by itself was not. Put differently: There may be cases in which suppression of evidence obtained during a consent search may be necessary to vindicate a defendant's rights that were violated by earlier, unlawful police conduct.

"Whether suppression is required in any such case will, however, depend on *the nature of the connection between the unlawful police conduct and the evidence sought to be suppressed*. As we have noted previously, evidence is subject to suppression in a criminal prosecution if it was *'obtained in violation* of a defendant's rights under [Article I, section 9].' *State v. Davis*[, 313 Or 246, 253, 834 P2d 1008 (1992)] (emphasis supplied). Under that standard, there will have to be, at the very least, a causal connection between the unlawful police conduct and the evidence uncovered during the subsequent consent search. Thus, where the evidence would have been obtained even in the absence of the unlawful police conduct—*i.e.*, where there is no causal connection between the unlawful conduct and the discovery of the evidence—the mere fact that the evidence was obtained *after* that conduct will not require suppression.[1]

"*A causal connection alone, however, still is not sufficient to require suppression.* This court has rejected the so-called 'but for' test, which would require the suppression of any evidence that would not have been discovered 'but for' the unlawful police conduct. *State v. Quinn*, 290 Or 383, 394-97, 623 P2d 630 (1981);[2] *State v. Kennedy*, 290 Or 493,

---

[1] The majority states that the court in *Rodriguez* "observed that, where the evidence would have been seized in the absence of unlawful conduct and the discovery of the evidence was inevitable, 'the mere fact that the evidence was obtained *after* that conduct will not require suppression.'" 183 Or App at 58 (quoting *Rodriguez*, 317 Or at 39) (emphasis in *Rodriguez*). However, the statement from *Rodriguez* appears to reflect an independent source theory as opposed to an inevitable discovery theory. The inevitable discovery theory

"in a sense, is a variation upon the 'independent source' theory, but it differs in that the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of a [constitutional] violation would inevitably have been discovered lawfully." Wayne R. LaFave, 5 *Search and Seizure* § 11.4(a), 241 (3d ed 1996).

[2] In *Quinn*, the defendant had been arrested and jailed for burglary, and his car had been impounded. Twenty-two hours later, the police unlawfully searched

500-01, 624 P2d 99 (1981). Thus, the fact that, 'but for' the unlawful conduct, the police would not have been in a position to (for example) seek a person's consent does not, in and of itself, render any evidence uncovered during the ensuing consent search inadmissible.

"In what circumstances, then, does unlawful police conduct render evidence obtained in a later consent search

the defendant's car without a warrant. Women's undergarments were found during the search. The next day, homicide detectives in another county were told of the discovery of the undergarments. The detectives considered the defendant to be a suspect in the murder of an elderly woman. The following day, the arresting officer and another officer interviewed the defendant about several other thefts. The officers asked the defendant for consent to search his car. After advising the defendant that he need not consent and that any evidence that was discovered could be used against him, the defendant consented. The officers never mentioned the undergarments or the murder. Later that afternoon, the homicide detectives searched the car and seized the undergarments and interviewed the defendant. During that interview, the defendant confessed to the murder. The court concluded that "[t]his case, however, involves independent causation rather than attenuation of the original causation because this defendant's decision to consent was not the product of unlawful police conduct, whether direct or remote." *Quinn*, 290 Or at 396 n 3. In sum, the court stated that

"the women's underwear might not have come to light had the officer not reached under the car seat, but when the police sought defendant's consent to search, they did not do so by exploitation of that illegal discovery. Rather, the consent was sought and given by defendant for reasons entirely distinct from that primary illegality." *Id.* at 396.

The continued viability of *Quinn* was raised in *State v. Weaver*, 319 Or 212, 874 P2d 1322 (1994). The issue in *Weaver* was "whether defendant's written consent to search validated any search or seizure that occurred before defendant gave his consent." 319 Or at 214. The majority distinguished *Quinn* by reasoning that case law concerning the issue of whether evidence obtained during a consent search that followed unlawful conduct must be suppressed does not inform the issue of whether consent that follows an unlawful course of police conduct may retroactively validate that prior unlawful conduct. According to the majority, it did not determine whether *Quinn* remained a valid statement of the law that could be relied on in the future. *Weaver*, 319 Or at 221 n 9.

Justice Gillette concurred, reasoning that the majority had left the false impression that *Quinn* remained an accurate statement of the law. According to the concurrence, the officers in *Quinn*

"would never have asked the defendant for permission to search the car, had it not been that their attention was directed to him and the car by the result of the earlier, illegal search. A more direct exploitation of illegal government activity would be difficult to posit.

"Because its analysis of the search and seizure issue is so suspect, it probably would be unwise for a party in the future to place much reliance on that portion of *Quinn*. Today's decision, although it distinguishes the case, does nothing to imply that, were the court required to address the issue, we would adhere to the *Quinn* search and seizure analysis." *Weaver*, 319 Or at 224 (Gillette, J., concurring).

inadmissible, where the consent to the search is voluntary? We think that evidence obtained during such a search should be suppressed only in those cases where the police have exploited their prior unlawful conduct to obtain that consent. Only where such exploitation occurs can it be said that the evidence discovered subsequently was 'obtained in violation' of a defendant's rights under Article I, section 9.

"Mere physical presence as a result of prior unlawful conduct does not constitute 'exploitation of that conduct. Exploitation occurs when the police take advantage of the circumstances of their unlawful conduct to obtain the consent to search. *State v. Williamson*, 307 Or 621, 772 P2d 404 (1989), provides one example of exploitation. There, during the stop of a pick-up at an unlawful roadblock, the police smelled what they believed to be marijuana in the bed of the pick-up. After the defendant had refused to allow a search, the police told the defendant that, unless he consented to a search, they would detain the vehicle until they could obtain a search warrant. The defendant then consented to the search, and the police discovered marijuana. This court held that the marijuana must be suppressed, because the police 'were trading on evidence that they had only by virtue of the unlawful roadblock.' 307 Or at 626." *Rodriguez*, 317 Or at 38-40 (footnote omitted; some emphasis added; first set of brackets in original).

In other words, while voluntariness concerns whether a defendant's consent was the product of the defendant's free will rather than the result of express or implied coercion, exploitation concerns whether the police *took advantage* of the circumstances of their unlawful conduct *to obtain the consent* to search.

With regard to the facts in *Rodriguez*, the court ultimately held that "the police did not exploit any unlawful conduct to obtain [the] defendant's consent." 317 Or at 41. The court reasoned that, after the defendant's purportedly unlawful arrest, the INS agent asked the defendant if he had drugs or guns in his apartment. The court noted that the question was not unlawful because the defendant had been read his *Miranda* rights, stated that he understood them, and was under no compulsion to answer the question. *Id.* at 41 n 15. In response, the defendant said, " 'No, go ahead and

look.' " *Id.* at 41. Thereafter, the INS agent confirmed that the defendant was giving his consent. The court concluded:

> "Given those facts, it is apparent that the INS agent did not trade on or otherwise take advantage of the arrest to obtain defendant's consent to the search. Indeed, there is absolutely nothing in the encounter between the agent and defendant that can be construed as exploitation of the purportedly unlawful arrest. The mere fact that, but for the arrest, the agent would not have been standing in the doorway of defendant's apartment, in a position to ask defendant about drugs and guns, does not render the evidence discovered in the subsequent consent search inadmissible." *Id.*

*Rodriguez* indicates that the suppression of evidence to vindicate a defendant's rights under Article I, section 9, of the Oregon Constitution, is required where (1) a "but for" causal connection exists between the unlawful conduct and the evidence sought to be suppressed *and* (2) "the police have exploited their prior unlawful conduct to obtain that consent" or, in other words, take advantage of the circumstances of their unlawful conduct to obtain consent to search.[3] *Rodriguez*, 317 Or at 40. Ultimately, even if a "but for" causal connection exists between the unlawful conduct and the evidence sought to be suppressed, the facts of the case must support a conclusion that the *nature of the causal connection* is sufficient to require suppression.

As *Rodriguez* dictates, each of the Supreme Court's and this court's decisions concerning whether the police have exploited unlawful conduct in order to obtain a defendant's consent involves an examination of the nature of the particular causal connection to determine if suppression is required. Each case is highly dependent on its facts. However, three general categories of cases emerge. In the first category of cases, suppression is not required because there is simply no causal connection between the unlawful conduct

---

[3] I note that the Oregon Supreme Court

"has stated that, 'unlike the Fourth Amendment exclusionary rule, which has been based on deterring police misconduct, exclusions under Article I, section 9, have been based on the personal right to be free from an unlawful search and seizure.' " *State ex rel Juv. Dept. v. Rogers*, 314 Or 114, 119, 836 P2d 127 (1992) (footnote omitted) (quoting *State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987)).

and the evidence that the defendant seeks to suppress. Often a causal connection is lacking because the police requested consent for reasons independent of the unlawful conduct.[4] In the second category of cases, the pivotal factor in determining whether the police exploited information obtained only by virtue of their unlawful conduct is whether the defendant's knowledge that the police have discovered the information is a substantial factor in his or her decision to consent.[5] In the

---

[4] *See State v. Dinsmore,* 182 Or App 505, 516-19, 49 P3d 830 (2002) (rejecting the defendant's argument that the police exploited an unlawful interview with her by asking her to perform field sobriety and breath tests, because the officer's requests were based on information that he had independent of the unlawful interview); *State v. Lee,* 174 Or App 119, 124, 23 P3d 999, *rev den* 332 Or 559 (2001) ("When [the officer] asked for consent, there were no threats or promises made or offered. There is no evidence of the officers trading on their alleged unlawful conduct. There is no evidence that they took advantage of the situation in any way. Defendant's response to the officers' request to come outside the apartment certainly provided the opportunity for the officers to ask for his consent to search the apartment. But there is no evidence that it was the reason for seeking the consent. Instead, the record shows that the reason for asking for consent to search the apartment was the victim's report that defendant had participated in a robbery."); *State v. Schwartz,* 173 Or App 301, 307-08, 21 P3d 1128, *rev den* 333 Or 162 (2001) ("Even before the warrant was obtained, the police were interested in investigating and talking to defendant. * * * In this case, there is *no* causal connection, 'but for' or otherwise, between the allegedly unlawful police conduct and the obtaining of the evidence that defendant sought to have suppressed.") (emphasis in original); *State v. Herrera-Sorrosa,* 154 Or App 28, 959 P2d 619, *adhered to in part on recons* 155 Or App 227, 963 P2d 728 (1998) (assuming that the defendant was detained unlawfully, the stop did not reveal information so as to cause the officer to request consent); *State v. Wenger,* 143 Or App 90, 98-99, 922 P2d 1248 (1996) ("It is true that [the arresting officers] were able to arrest defendant immediately, because he was unlawfully stopped at the time. However, the unlawful stop, itself, did not reveal to the officers the information that defendant had just completed a drug transaction. That information was gained independently by [another officer], and could therefore provide untainted probable cause for defendant's arrest. * * * [D]efendant's consent to the search of his vehicle was not the result of exploitation of the unlawful stop. The officers were not prompted to seek his consent to the search by any information gained from defendant during the unlawful stop. Instead, they were prompted to seek his consent to a search of the van by the evidence of the marijuana and cash that they discovered during the lawful search of his person incident to his arrest.").

[5] *See Williamson,* 307 Or 621 (apparently reasoning that exploitation occurred under the following circumstances: after an unlawful detention, the officer smelled marijuana, told the defendant that he smelled the marijuana, gave the defendant *Miranda* warnings, advised him of his right to refuse consent, and told the defendant that, unless he consented, the officer would detain the vehicle to seek a search warrant); *Quinn,* 290 Or at 396 n 3 (reasoning that, where the defendant was unaware that the police had discovered the undergarments, the "defendant's decision to consent was not the product of unlawful police conduct, whether direct or remote"); *State v. Martin,* 124 Or App 459, 863 P2d 1276 (1993) (reasoning that exploitation occurred under the following circumstances: the officer handcuffed the

third category of cases, the existence of an intervening circumstance that separates the unlawful conduct from the evidence sought to be suppressed is an important factor in determining whether the police have exploited that conduct.[6]

We and the Supreme Court have also applied exploitation analysis in determining whether a defendant had abandoned his interest in the property that he sought to suppress. That case law concerning abandonment also indicates that the existence of an intervening circumstance is an important factor in determining whether the police have exploited their unlawful conduct. For example, in *State v. Knox*, 160 Or App 668, 676, 984 P2d 294, *rev den* 329 Or 527 (1999), the issue was whether the defendant's relinquishment of a pouch containing cocaine in the back of a police car "was obtained by the exploitation of the illegal search of *his* vehicle while it was in the grocery store parking lot." (Emphasis in original.) We reasoned:

> "The 'exploitation' analysis used in *Rodriguez* is applicable to the facts in [*State v.*] *Morton*[, 326 Or 466, 953 P2d 374 (1998),] and to this case. Although the *Morton* court did not expressly apply an 'exploitation' analysis, it is apparent that that is what the court employed. In holding that the container was subject to suppression, the court concluded that the dropping of the container could not be separated from the process of the execution of the arrest based on an invalid warrant. The causal connection between the arrest and the dropping of the container was not interrupted by any intervening events, and the unlawful police conduct

defendant, discovered methamphetamine during an illegal search incident to arrest, placed the defendant in the patrol car, asked the defendant several questions about the contents of the Dristan tin (which contained the methamphetamine) and confronted the defendant with a paper bag and asked if it contained more drugs); *cf. State v. Somfleth*, 168 Or App 414, 8 P3d 221 (2000) (reasoning that exploitation occurred under the following circumstances: from an unlawful vantage point, the officer observed what he believed was a methamphetamine laboratory and told the defendant's wife that he believed there was a laboratory in the garage, that such a laboratory was highly dangerous and that, if she refused to consent to a search of the garage, he could obtain a warrant).

[6] *See Rodriguez*, 317 Or at 41 & 41 n 5 (where, after the purportedly unlawful arrest, the INS agent asked the defendant if he had drugs or guns in his apartment and the defendant responded by consenting to the search, the court reasoned that the officer's question was not unlawful because the defendant had been read his *Miranda* rights, stated that he understood them, and was under no compulsion to answer the question).

directly coerced Morton's actions. To permit the admissibility of the evidence in *Morton* would be to permit the police to exploit or take advantage of the unlawful arrest.

"Here, in contrast to *Morton*, the illegal search in the parking lot merely began the chain of events that led to the subsequent discovery of the pouch in the patrol car at the police station. Factually, the seizure of the pouch was *separate* from any police illegality. As the court noted in *Rodriguez*, the mere physical presence of the officer at the police parking lot because of the events that began with the search of defendant's car does not, by itself, constitute an exploitation of the illegal search. The search and the arrest for what was discovered in defendant's car were complete when defendant was handcuffed and placed in the patrol car. His transportation to the police station during which his alleged deposit occurred was an event that intervened between the illegal search and seizure and the seizure at issue here." *Knox*, 160 Or App at 678-79 (emphasis in original; citation omitted).

As we explained in *Knox*, the Supreme Court applied an exploitation analysis in *Morton* to determine whether the defendant had abandoned her interest in the container that she sought to suppress. The court noted that the container fell from the defendant's jacket while she was being placed under arrest. The court concluded that

"defendant dropped the container only after the police had begun the process of taking defendant into custody pursuant to the arrest warrant. Thus, in this instance, the state *cannot separate the act of arrest from the dropping of the container*; the seizure can be proper only if the arrest itself was authorized by a valid warrant." *Morton*, 326 Or at 470 (emphasis added).

The court ultimately concluded that the defendant's arrest was invalid. In determining whether the police exploited the unlawful arrest, one factor that appeared to be important to the court in *Morton* was the temporal proximity between the unlawful conduct and the defendant's relinquishment of the container.

In sum, while the case law does not reflect an exclusive set of factors to be used in determining whether the nature of the causal connection requires suppression, it

reflects the following factors that inform our analysis: (1) the existence of a "but for" causal connection between the unlawful conduct and the evidence sought to be suppressed; (2) the existence of circumstances indicating that the police obtained information only by virtue of the unlawful conduct and that a defendant's knowledge that the police have discovered the information is a substantial factor in his or her decision to consent; (3) the existence of an intervening circumstance that separates the unlawful conduct from the evidence sought to be suppressed; and (4) the temporal proximity between the unlawful conduct and a defendant's consent. If a "but for" connection exists, no other factor is necessarily dispositive as a matter of law and no bright-line rule exists in determining whether suppression is required under Article I, section 9, of the Oregon Constitution, in order to vindicate a defendant's rights.[7] In each case, the trial court must make factual findings concerning the factors that are pertinent to the ultimate legal question of whether exploitation has occurred and then evaluate those facts to determine whether the nature of the causal connection is such that it can be said that the police exploited or traded on their unlawful conduct.

With those principles in mind, I would turn to our decision in *Stanley*, which articulates the test that the majority appears to apply in reaching its decision. As noted above, in that case, we held that "exploitation occurs when unlawful police conduct reveals information that focuses police attention on the defendant and prompts them either to seek the defendant's consent or to ask questions leading to consent." *Stanley*, 139 Or App at 535. That test is appealing because, at least on the face of it, it is a simple, bright-line test for determining whether the police exploited their unlawful conduct. On closer examination, however, it is not a very meaningful test, and, as discussed above, it does not reflect the more complex analysis that we have actually applied in determining whether exploitation has occurred in a particular case. Under

---

[7] The concurrence incorrectly characterizes my position when it states that I "appear[ ] to believe that exploitation can occur only if the facts 'demonstrate that a substantial factor in defendant's decision to consent was his knowledge that Deese had discovered information during the unlawful stop.'" 183 Or App at 62 (Brewer, J., concurring). While that is one factor to consider and is the pivotal factor *in this case,* the circumstances of a particular case may demonstrate that exploitation has occurred even if that factor is not present.

the test as articulated in *Stanley*, it is difficult to imagine an encounter between a police officer and a defendant that will not yield some information to the officer's trained eye. As a consequence, exploitation will occur whenever, because of an unlawful restraint, an officer observes something incriminating or nonincriminating and consent is requested thereafter. In other words, if consent follows unlawful activity, suppression will be necessary. That is "but for" causation, which the Supreme Court rejected in *Rodriguez*. The broad holding in *Stanley* eliminates consideration of the various factors reflected in the case law, which have played an important role in our analysis.

Moreover, *Stanley* focuses the analysis on the wrong person. The proper focus under an exploitation analysis is not on why the officer acted but why the defendant consented.[8] If the illegally obtained information was a substantial factor in the defendant's otherwise voluntary consent, exploitation will occur. For those reasons, I would disavow the language in *Stanley*, and, to the extent that the majority's reasoning depends on *Stanley*, I believe it is incorrect.[9]

---

[8] The majority takes us to task because of our statement that the proper focus in an exploitation analysis is on why *defendant* consented. The majority asserts that we must focus only on whether the police took advantage of the circumstances. However, whether the police *took advantage* of the circumstances in a particular case necessarily includes consideration of all of the factors we have discussed. It would simply make no sense to consider the activities of the police following their unlawful conduct in a vacuum without any consideration of their effect on the defendant. Neither *Rodriguez* nor the majority in *Weaver* requires the officer's state of mind to be the focus of the exploitation analysis. Moreover, it does not follow as a matter of logic that, because voluntariness concerns the defendant's state of mind, exploitation must concern the officer's state of mind. The concurrence agrees:

"[A] defendant's reasons for giving consent to a search may be relevant to an exploitation analysis. It is not uncommon for a defendant's knowledge that the police had obtained information to affect the decision to give consent. The existence of such knowledge logically can contribute to a determination that the police took advantage of unlawful conduct." 183 Or App at 62 (Brewer, J., concurring).

[9] The majority states that I "appear[ ] to reason that all that could exist here, under the trial court's findings, is mere causation between the illegal stop and Deese's observation of the bulge in defendant's pocket as, in its view, also occurred in *Stanley*." 183 Or App at 60. I note that, although I would disavow the particular language explaining the exploitation analysis in *Stanley*, I have not analyzed the circumstances of that case, which are different from the circumstances of this case, in light of the factors that I have identified, and I have not determined whether the outcome in *Stanley* is correct.

The majority also states:

> "Here, Deese's testimony establishes that he took advantage of his unlawful stop of defendant to obtain defendant's consent to search. He had no reason for stopping defendant other than to conduct a criminal investigation. His detention of defendant was unsupported by a reasonable suspicion that defendant had committed any criminal offense. Although Deese's initial gesture could, under different circumstances, have constituted a mere request for a police-citizen encounter, the conduct that followed demonstrates that each successive action took advantage of the preceding circumstances to obtain defendant's consent to search. Deese stopped defendant to ask for identification without reasonable suspicion that he had committed a crime. After procuring defendant's identification and while waiting for the record check to be completed, he continued his criminal investigation by asking questions about weapons. During that time, he observed the bulges in defendant's jacket, and he expressly testified that his observation led him to request consent to search. Thus, Deese took advantage of the circumstances of his unlawful conduct to obtain defendant's consent, and it is that exploitation of the circumstances that distinguishes this case from the facts in [State v.] Peppard[, 172 Or App 311, 18 P3d 488, *vacated and remanded* 332 Or 630, 34 P3d 168 (2001), *on remand* 179 Or App 478, 40 P3d 563 (2002),] and [State v.] Arabzadeh[, 162 Or App 423, 986 P2d 736 (1999)]."[10] 183 Or App at 59 (emphasis added).

Based on that passage, the majority appears to reason that, after the unlawful stop, Deese *took advantage of* the stop by asking for identification, he *took advantage of* the request for identification by asking about weapons, he *took advantage of*

---

[10] This paragraph raises two concerns. First, I do not understand that Deese *expressly* testified that he requested consent because of the observation. The trial court did not make a finding about the reason that Deese requested consent to search. I do acknowledge, however, that, based on the testimony, *one* reasonable inference is that Deese requested consent because of his observation. Second, as support for its conclusion that exploitation occurred in this case, the majority states that the circumstances here are different from those in *Peppard* and *Arabzadeh*. I note, however, that the Supreme Court vacated our decision in *Peppard*, and, on remand, we did not reaffirm our reasoning concerning exploitation. Additionally, *Arabzadeh* was a case in which no causal connection existed. While *Arabzadeh* would assist the majority in demonstrating that a causal connection exists in this case, it does not assist the majority in explaining why the nature of the causal connection demonstrates that exploitation has occurred.

the questions about weapons by observing the bulges in defendant's jacket, and he *took advantage of* the observation by asking for consent to search. That reasoning demonstrates nothing more than a "but for" chain of causation between the unlawful stop and the request for consent. Moreover, other than identifying the links in the causal chain, the majority does not examine the *nature of the causal connection* in light of the factors identified above. Consequently, I believe that the majority does not correctly apply the concept of exploitation as it has been articulated in our case law.

In my view, in determining whether exploitation has occurred, rather than applying the limited and more general test articulated in *Stanley*, a court should consider all of the pertinent factors previously identified. In this case, there is a "but for" connection between the unlawful detention and the evidence that defendant seeks to suppress. Further, the unlawful detention and the request for the consent are close in time, and there is no intervening circumstance to separate the unlawful conduct from the evidence sought to be suppressed. Thus, the critical factor *in this case* is the existence of circumstances indicating that Deese obtained information only by virtue of the unlawful detention and that, if defendant had knowledge that Deese had discovered the information, that knowledge was a substantial factor in his decision to consent. In other words, we must determine whether the facts in this case demonstrate that a substantial factor in defendant's decision to consent was his knowledge that Deese had discovered information during the unlawful stop. On that point, the evidence is conflicting. Deese testified, in part, that

> "I just ran a routine check which I do quite frequently to see if he had any wants or warrants and then I, after calling dispatch I handed him back his I.D. and I asked him, at that time I noticed he was wearing a jacket, I'm not sure if it's the one he has on now, but I noticed it looked like it had items inside of it. I asked him if he had any weapons or knives or any illegal drugs on him. He said, 'no.' And I said, 'Would you mind if I checked?' And he said, 'no go ahead.' So in checking him, I found no illegal weapons; however, in his right or left-front pocket I found, I felt an object and I retrieved the same and saw that it was a glass v[ial] commonly used to hold controlled substances."

Defendant testified, in part:

> "He says, 'Why are you looking so nervous?' I says, 'I'm not nervous.' He says, I had my coat, it was a different coat, I had my coat zipped shut and I had my gloves on and they were slightly hanging out. He says, 'That bul[ge] in your coat is making me a little nervous. What * * * do you got any guns or drugs in there?' I said, 'No they're my gloves.'"

On cross-examination, Deese also testified as follows:

> "Q  Did [defendant] show you those gloves or did you remove the gloves?
>
> "A  I don't really recall if he showed them to me or if I felt them and asked what they were."

Because the trial court apparently determined that defendant was not stopped, it had no reason to consider whether Deese exploited the unlawful detention to obtain defendant's consent. The trial court did not make a factual finding concerning the reason that Deese requested defendant's consent to search and made no pertinent factual findings concerning exploitation. There is conflicting evidence concerning what occurred after the unlawful stop and its effect, if any, on defendant's decision to consent. As we indicated in *State v. Rocha-Ramos*, 161 Or App 306, 313, 985 P2d 217 (1999),

> "[t]he trial court did not consider the issue of whether the officers' observations constituted an exploitation of their illegal stop. On remand, the trial court must decide that issue and make the appropriate rulings that follow as a legal consequence."

This case should be remanded to the trial court so that it can determine in the first instance whether Deese exploited the unlawful detention.

For all of the above reasons, I respectfully dissent.

Landau, Linder, and Kistler, JJ., join in this dissent.